George W. LEWIS et al., Appellants in No. 76–1456,

v.

William F. HYLAND, Individually and in his official capacity as Attorney General of the State of New Jersey, et al., Appellees.

Appeal of Peter HOOK et al., in No. 76–1457.

Nos. 76–1456, 76–1457.

United States Court of Appeals, Third Circuit.

Argued Dec. 3, 1976.

Decided March 25, 1977.

As Amended April 19, 1977.

---

Frank Askin, Larry M. Gross, Rutgers Constitutional Litigation Clinic, Newark, N. J., for George W. Lewis et. al.; Melvin L. Wulf, American Civil Liberties Union Foundation, New York City, of counsel.

William F. Hyland, Atty. Gen. of N. J., Trenton, N. J., for appellees in 76–1456 and for appellants in 76–1457.

Stephen Skillman, Asst. Atty. Gen., of counsel; Erminie L. Conley, Deputy Atty. Gen., Trenton, N. J., on the brief.

Before ROSENN, FORMAN and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

Plaintiffs, representatives of discrete classes of travelers upon New Jersey roads, come before us for a fourth time in their laborious efforts to secure injunctive relief against the New Jersey State Police for alleged violations of Fourth Amendment ·and other rights.

When this case initially was before us, we determined that the complaint set forth facts which, if proved, would justify a federal equitable remedy. *Lewis v. Kugler,* 446 F.2d 1343· (3d Cir. 1971), *rev'g in part* 324 F.Supp. 1220 (D.N.J.). Plaintiffs have now substantiated (and, indeed, augmented) their initial allegations. The district court's extensive findings of fact reveal what can only be described as callous indifference by the New Jersey State Police for the rights of citizens using New Jersey roads. Were it not for the Supreme Court's opinion in

*Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), which was announced after the district court proceedings had been concluded,[1] our original mandate in this case, *see* 446 F.2d at 1350, *supra,* would have required that we reverse the district court's denial of injunctive relief in light of plaintiffs' demonstration of numerous violations of their constitutional rights.

The Supreme Court, however, has recently given expression to the doctrine of federal equitable abstention as it relates to federal court intervention in local police operations. In light of *Rizzo v. Goode, supra,*[2] in which the Supreme Court reversed this Court's approval of an injunction against widespread police abuses in Philadelphia, we conclude that the record of law enforcement abuses as it appears in this case—dismaying as it is—will not support federal injunctive relief.

## I.

One measure of the tortuous procedural history of this litigation is the fact that the original complaint was filed in December 1970—long before the Supreme Court announced its decision in *Rizzo v. Goode, supra,* and indeed, before the opinion in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), in which concepts of equity, comity and federalism were reviewed.

Plaintiffs here sought injunctive relief against an alleged "pattern and practice of unreasonable searches of vehicles and travelers carried on without probable cause." Claiming to represent a class of "persons who travel upon the public toll roads and highways of the State of New Jersey" and who suffer such deprivations at the hands of the state police, and also claiming to represent a subclass of "persons of highly individualized personal appearance"— "long-haired highway travelers"—suffering similar deprivations because of their distinctive appearance, plaintiffs named as defendants state officials and the membership of the State Police.[3]

Despite plaintiffs' detailing of 25 separate alleged police-citizen incidents in 17 pages of the original complaint, the district court, after a hearing on plaintiffs' motion for a preliminary injunction, granted defendants' motion to dismiss. 324 F.Supp. 1220 (D.N.J.1971). This Court reversed in part, 446 F.2d 1343 (3d Cir. 1971),[4] and remanded the case to the district court for further proceedings.

The gravamen of this Court's reversal and remand in 1971 was stated as follows:

> If the plaintiffs can establish that they are subjected to a deliberate pattern and practice of constitutional violations by the New Jersey State Troopers, we believe that they are entitled to appropriate injunctive relief. Persons who can establish that they are being denied their constitutional rights are entitled to relief, and it can no longer be seriously contended that an action for money damages will serve adequately to remedy unconstitutional searches and seizures.

446 F.2d at 1350 (footnotes omitted.)[5] While we there noted the difficulties inher-

---

1. *See, e. g., Thorpe v. Housing Authority,* 393 U.S. 268, 281–82, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) ("An appellate court must apply the law in effect at the time it renders its decision"). The December 22, 1975 transcript of proceedings before the district court revealed concern by counsel as to the outcome of *Goode v. Rizzo,* 506 F.2d 542 (3d Cir. 1974) in the Supreme Court.

2. *See also Conlisk v. Calvin,* 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976), *vacating & remanding* 520 F.2d 1 (7th Cir. 1975).

3. Named as defendants were New Jersey's Attorney General, its Superintendent of State Police, 14 individual New Jersey State Troopers and all other State Troopers participating in the "pattern and practice" of illegal searches of the named plaintiffs.

4. Applying the then-recent decision in *Younger v. Harris, supra,* and its companion cases, the Court held that those plaintiffs against whom state criminal prosecutions were pending could not claim a right to injunctive or declaratory relief. *See* 446 F.2d at 1348–49. Accordingly, the Court sustained the district court's dismissal as to 10 of the 27 named plaintiffs.

5. As authority for the propriety of federal injunctive relief in such circumstances, this Court placed principal reliance upon *Hague v.*

ent in providing effective injunctive relief for citizens without obstructing the law enforcement duties of the police,[6] this problem was not viewed as insurmountable. If the facts substantiated plaintiffs' complaint, the district court was clearly expected to invoke its "very broad power"[7] to "fashion an appropriate remedy that [would] protect the constitutional rights of citizens, while preserving the integrity and efficiency of the law enforcement authorities."[8]

Pursuant to this directive, the district court held an evidentiary hearing at which 50 of plaintiffs' witnesses testified. Plaintiffs renewed their motion for a preliminary injunction; defendants once again moved to dismiss the complaint or for entry of judgment in their favor. The district court judge refused to grant either plaintiffs' or defendants' motions, reserving decision until the defendants presented their case. Plaintiffs appealed from the district court's order of December 28, 1971 denying their motion for a preliminary injunction. The district court's denial of an interim injunction was thereafter sustained by a judgment order of this Court. *Lewis v. Kugler,* No. 72–1137 (3d Cir. May 8, 1973).

In the interim, the litigation encountered the first in a series of events which account for its present procedural posture. With the case ready for decision in the district court, the district court judge who had been presiding over the hearings died. The litigation was then transferred, over plaintiffs' protests, from Newark to the district court in Camden, New Jersey.[9] A pre-trial order was executed specifying that the case would be tried on the record as it then stood, supplemented by several additional witnesses for plaintiffs "whose testimonies will be representative of recent incidents of alleged misconduct by state troopers against 'long-haired travelers' on the state's highways."[10]

Before this order could be implemented, the district court judge in Camden, to whom the case had been reassigned, died. After reassignment to a third district court judge, the parties agreed that, save for several supplementary depositions, the case should be decided on the then-existing record. In January 1974 these depositions were taken, and the case was once again ready for decision.

This time retirement intervened. This third district court judge to whom the case was now assigned, assumed senior status. It was at this time that the case came before the district court judge whose order we now review. The parties again agreed to submit the case on the record developed to that date, save for the addition of one affidavit. On that record, and without additional or live testimony, plaintiffs again sought a temporary injunction; once again, that relief was denied. The district court then reserved decision on certification of the putative classes plaintiffs claimed to represent, indicating that the class action determination would turn on its resolution of the equitable claims.[11]

That resolution came on November 13, 1975. The district court issued an unpublished opinion cataloging 66 separate controverted highway incidents involving state troopers and citizens. Of this number, 34 involved "clear violations of Fourth and

CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), and *Lankford v. Gelston,* 364 F.2d 197 (4th Cir. 1966) (en banc). These cases have recently been given a rather different reading, *see Rizzo v. Goode, supra,* 423 U.S. at 373–374 & n. 8, 96 S.Ct. 598; *compare id.* at 382, 385–86 n. 2, 96 S.Ct. 598 (Blackmun, J., dissenting).

6. 446 F.2d at 1351–52.

7. *Id.* at 1351.

8. *Id.* at 1352.

9. This transfer prompted plaintiffs to seek a writ of mandamus from this Court requiring Chief Judge Coolahan to vacate his reallocation order. Plaintiffs' petition was denied, *Lewis v. United States District Court,* No. 72–2147 (3d Cir. January 24, 1973).

10. Order of September 13, 1973.

11. *See* Transcript of October 29, 1974 at 12. Class certification was denied in the Final Judgment in this case. *See* Order of January 14, 1976. In light of our disposition, we need not consider the propriety of the denial of class certification.

Fourteenth Amendment rights." The district court judge went on to "take judicial notice of the fact that a relatively small number of those whose rights were violated were represented before the court."

Despite the court's findings of constitutional violations by New Jersey State Troopers, injunctive relief was denied. In essence, the district court reasoned that the number of incidents of police abuse of citizens' rights, even extrapolating beyond those proved in this case, paled in comparison with the overwhelming number of routine contacts between Troopers and travellers.[12] The evidence was found to reveal no "deliberate pattern and practice" of abuse by responsible officials; rather, the fault lay in the "willful and random acts . . of a minority of the Troopers."

In addition, the court found no "substantial threat" of future violations by abusive Troopers. The passage of time, a general acceptance of diverse life-styles and appearances and the threat of this litigation were all accorded a beneficial effect. In the absence of pressing need, injunctive interference in police operations was determined to be unwise.

Still, the district court felt duty-bound to follow our earlier mandate to remedy any constitutional violations. With injunctive relief held to be unavailable, the district court, apparently *sua sponte*, stated that it would entertain applications for money damages against those individual Troopers who had violated the constitutional rights of named plaintiffs.[13] By an order dated January 14, 1976, the court awarded damages totalling $600 against three individual Troopers.

Plaintiffs appeal from that portion of the court's final judgment which denied injunctive relief. They also appeal from the

court's refusal to permit them to add additional named defendants against whom they desired an award of money damages. They also contest the sufficiency of damages awarded.

Defendants appeal from the court's award of damages and its denial of a jury trial on that issue.

## II.

As we have previously noted, plaintiffs' demand for injunctive relief encounters a roadblock of formidable dimensions in *Rizzo v. Goode, supra.* In *Rizzo,* plaintiffs represented two classes of Philadelphia citizens ("minorities," and citizens generally). They complained of repeated violations of Fourth and Fourteenth Amendment rights by the Philadelphia police—in particular, by two named officers. A total of 28 alleged incidents were before the district court, at least 16 of which involved police violations of citizens' constitutional rights. Plaintiffs there sought injunctive relief, just as they do here.

Like the instant case, the district court in *Rizzo* found that the incidents, despite their limited number, were neither rare nor isolated; unlike this case, however, the district court in *Rizzo* granted plaintiffs their requested injunctive relief. *C. O. P. P. A. R. v. Rizzo,* 357 F.Supp. 1289 (E.D.Pa.1973). Defendants were directed "to submit to [the District] Court for its approval a comprehensive program for improving the handling of citizen complaints alleging police misconduct." *Id.* at 1322.

The *Rizzo* result was a modified complaint procedure, set forth in "an all-encompassing 14-page document,"[14] which followed the district court's suggested guidelines.[15] On appeal, this Court affirmed,

---

**12.** The district court opinion observes that: "it would be entirely reasonable to find that there were *at least* 1,500,000 police contacts with automobile occupants during the three year period involved in this case."

**13.** As discussed in Part III *infra*, the court's invitation appears to be the first and only indication that compensatory money damages

were embraced or contemplated as a part of the remedy sought by plaintiffs.

**14.** 423 U.S. at 365 n. 2, 96 S.Ct. at 601.

**15.** These guidelines called for:

(1) Appropriate revision of police manuals and rules of procedure spelling out in some detail, in simple language, the "dos and

stressing the "limited and moderate" nature of the relief granted. *Goode v. Rizzo*, 506 F.2d 542, 547–48 (3d Cir. 1974).

The Supreme Court did not agree. By a 5–3 decision, the judgment of this Court was reversed. *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Although some have read Mr. Justice Rehnquist's majority opinion in *Rizzo* as the harbinger of a "nullification" of the Fourteenth Amendment,[16] and while the case undoubtedly represents an extension of the doctrine of *Younger v. Harris, supra,* insofar as federal intervention in state police practices is concerned,[17] we decline to give *Rizzo* such a broad reading. Nonetheless, because we find the instant case to be controlled by *Rizzo* with respect to the proved constitutional violations and the proposed injunctive remedy, the narrow holding in *Rizzo* must govern the result here.

Although *Rizzo* discusses "standing" and "federalism", *i. e., Younger v. Harris,* the gravamen of *Rizzo* is to be found in its analysis of the district court's "unprecedented theory of § 1983 liability." 423 U.S. 373–77, 96 S.Ct. 598.

*Rizzo's* § 1983 discussion, like its "standing" discussion, was aimed at the failure of plaintiffs to prove the existence of an unconstitutional policy or plan adopted and enforced by the official defendants. Throughout, the Court emphasized the complete absence of any causal link between the individual police officers' conduct and the responsible authorities. Mere invocation of the words "pattern" or "plan" did not suffice without this causal link. Nor was it sufficient in *Rizzo* to have proved 16 to 20 incidents "of constitutional dimension" where the number of police-citizen contacts was many times greater.

■ *Rizzo's* focus was on the absence of any evidence (beyond what was dismissed as "[t]he District Court's unadorned finding of a statistical pattern") of participation by the named defendants in a plan or scheme to suppress constitutional rights. Such a plan, once proved, could be enjoined in federal court. *Allee v. Medrano*, 416 U.S. 802, 815–16, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *Lankford v. Gelston*, 364 F.2d 197, 202 (4th Cir. 1966) (en banc) (enjoining the "effectuation of a plan conceived by high ranking [police] officials").

The *Rizzo* Court refused to infer the existence of a plan of concerted action from the facts before it. A mere *"failure* to act [by responsible authorities] in the face of a statistical pattern"[18] was found to provide no basis for injunctive relief.

This discussion and holding did not go uncriticized. Mr. Justice Blackmun, dissenting in *Rizzo*, challenged the majority's narrowing of § 1983:

The Court today appears to assert that a state official is not subject to the strictures of 42 U.S.C. § 1983 unless he directs the deprivation of constitutional rights.

don'ts" of permissible conduct in dealing with civilians (for example, manifestations of racial bias, derogatory remarks, offensive language, etc.; unnecessary damage to property and other unreasonable conduct in executing search warrants; limitations on pursuit of persons charged only with summary offenses; recording and processing civilian complaints, etc.); (2) Revision of procedures for processing complaints against police, including (a) ready availability of forms for use by civilians in lodging complaints against police officers; (b) a screening procedure for eliminating frivolous complaints; (c) prompt and adequate investigation of complaints; (d) adjudication of non-frivolous complaints by an impartial individual or body, insulated so far as practicable from chain of command pressures, with a fair opportunity afforded the complainant to present his complaint, and to the police officer to present his defense; and (3) prompt notification to the concerned parties, informing them of the outcome.
357 F.Supp. at 1321.

**16.** Note, *Rizzo v. Goode: The Burger Court's Continuing Assault on Federal Jurisdiction,* 30 Rutgers L.Rev. 103, 148–51 (1976).

**17.** For other discussions of the *Rizzo* decision, see Note, *Rethinking Federal Injunctive Relief Against Police Abuse: Picking Up the Pieces After Rizzo v. Goode,* 7 Rutgers-Camden L. J. 530 (1976); *The Supreme Court, 1975 Term,* 90 Harv.L.Rev. 1, 238 (1976).

**18.** 423 U.S. at 376, 96 S.Ct. at 606.

*Ante,* [423 U.S.] at 375–377 [, 96 S.Ct. at 606–607.] In so holding, it seems to me, the Court ignores both the language of § 1983 and the case law interpreting that language. Section 1983 provides a cause of action where a person acting under color of state law "subjects, or causes to be subjected," any other person to a deprivation of rights secured by the Constitution and laws of the United States. By its very words, § 1983 reaches not only the acts of an official, but also the acts of subordinates for whom he is responsible. In *Monroe v. Pape,* 365 U.S. 167 [, 81 S.Ct. 473, 5 L.Ed.2d 492] (1961), the Court said that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions," *id.,* at 187, [81 S.Ct. at 484,] and that:

> "It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, *neglect,* intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by state agencies." *Id.,* at 180 [, 81 S.Ct. at 480.] (Emphasis in original.)

423 U.S. at 385, 96 S.Ct. at 610.[19]

Our earlier remand in the instant case, *Lewis v. Kugler,* 446 F.2d 1343 (3d Cir. 1971), clearly was in harmony with Justice Blackmun's statements.[20] Plaintiffs' proofs here are responsive to our directive in *Lewis v. Kugler,* but, as Justice Blackmun's

dissent in *Rizzo* reveals, the *Rizzo* Court has changed the operative standards.

Justice Rehnquist, writing for the majority in *Rizzo,* limited federal intervention into state police practices to those instances where it could be found that a pervasive pattern or policy of unconstitutional behavior was causally related to the named official defendants. He distinguished between this situation and one where only an unacceptably high number of incidents was proved, without the essential causal connection to the officials in charge. That distinction is best revealed by his discussion of § 1983 in this context:

> In *Hague [v. CIO, supra,]* the pattern of police misconduct upon which liability and injunctive relief were grounded was the adoption and enforcement of deliberate policies by the defendants there (including the Mayor and the Chief of Police) of excluding and removing the plaintiff's labor organizers and forbidding peaceful communication of their views to the citizens of Jersey City. These policies were implemented "by force and violence" on the part of individual policemen. There was no mistaking that the defendants proposed to continue their unconstitutional policies against the members of this discrete group.
>
> Likewise, in *Allee v. Medrano,* 416 U.S. 802 [, 94 S.Ct. 2191, 40 L.Ed.2d 566] (1974), relied upon by the Court of Appeals and respondents here, we noted that
>
> "[t]he complaint charged that the enjoined conduct was but one part of a *single plan* by the defendants, and the District Court found a *pervasive pattern of intimidation* in which the law

---

**19.** Justice Blackmun continued:

> I do not find it necessary to reach the question under what circumstances failure to supervise will justify an award of money damages, or whether an injunction is authorized where the superior has no consciousness of the wrongs being perpetrated by his subordinates. It is clear that an official may be enjoined from consciously permitting his subordinates, in the course of their duties, to violate the constitutional rights of persons with whom they deal. In rejecting the concept that the official may be responsible under § 1983, the Court today casts aside rea-

soned conclusions to the contrary reached by the Courts of Appeals of 10 circuits.

*Id.* at 385, 96 S.Ct. at 611 (footnotes omitted).

**20.** In Lewis v. Kugler, this Court stated that a § 1983 injunctive remedy would become appropriate:

> should the plaintiffs establish that a substantial threat of constitutional violations exists, either directed by or *tolerated by* officials of the New Jersey State Troopers or the State of New Jersey . . . .

446 F.2d at 1351.

enforcement authorities sought to suppress appellees' constitutional rights. In this blunderbuss effort the police not only relied on statutes . . . found constitutionally deficient, but concurrently exercised their authority under valid laws in an unconstitutional manner." *Id.,* at 812 [, 94 S.Ct., at 2198] (emphasis added).

The numerous incidents of misconduct on the part of the *named* Texas Rangers, as found by the District Court and summarized in this Court's opinion, established beyond peradventure not only a "persistent pattern" but one which flowed from an intentional, concerted, and indeed conspiratorial effort to deprive the organizers of their First Amendment rights and place them in fear of coming back. *Id.,* 814–815 [, 94 S.Ct. 2199–2200.]

Respondents stress that the District Court not only found an "unacceptably high" number of incidentals but held, as did the Court of Appeals, that "when a *pattern* of frequent police violations is shown, the law is clear that injunctive relief may be granted." 357 F.Supp., at 1318 (emphasis added). However, there was no showing that the behavior of the Philadelphia police was different in kind or degree from that which exists elsewhere; indeed, the District Court found "that the problems disclosed by the record . . . are fairly typical of [those] afflicting police departments in major urban areas." *Ibid.* Thus, invocation of the word "pattern" in a case where, unlike *Hague* and *Medrano,* the defendants are not causally linked to it, is but a distant echo of the findings in those cases. The focus in *Hague* and *Medrano* was not simply on the number of violations which occurred but on the common thread running through them: a "pervasive pattern of intimidation" flowing from a deliberate plan by the *named* defendants to crush the nascent labor organizations. *Medrano,* at 812 [, 94 S.Ct. at 2198.] The District Court's unadorned finding of a statistical pattern is quite dissimilar to the factual settings of these two cases.

The theory of liability underlying the District Court's opinion, and urged upon us by respondents, is that even without a showing of direct responsibility for the actions of a small percentage of the police force, petitioners' *failure* to act in the face of a statistical pattern is indistinguishable from the active conduct enjoined in *Hague* and *Medrano.* Respondents posit a constitutional "duty" on the part of petitioners (and a corresponding "right" of the citizens of Philadelphia) to "eliminate" future police misconduct; a "default" of that affirmative duty being shown by the statistical pattern, the District Court is empowered to act in petitioners' stead and take whatever preventive measures are necessary, within its discretion, to secure the "right" at issue. Such reasoning, however, blurs accepted usages and meanings in the English language in a way which would be quite inconsistent with the words Congress chose in § 1983. We have never subscribed to these amorphous propositions, and we decline to do so now.

423 U.S. at 374–76, 96 S.Ct. at 605–606.

■ As in *Rizzo,* the district court here made no finding relating the unconstitutional acts to the acts of the official defendants. To the contrary, the finding made by the district court—a finding which has adequate and reasonable support in the record, *see Government of Virgin Islands v. Gereau,* 523 F.2d 140, 144–46 & n. 14 (3d Cir. 1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976)—is:

there was no deliberate pattern and practice of violating Fourth and Fourteenth Amendment rights on the part of the Attorney General, the Superintendent, or the New Jersey State Police as a whole. Those instances of illegality were no more than willful and random acts on the part of a minority of the Troopers.

This finding was made after proof of 66 incidents, 34 of which were found to involve Fourth and Fourteenth Amendment violations. Before *Rizzo,* this number of violations might have been deemed sufficient to

establish a statistical pattern, warranting relief by the district court. However, the now-required additional element of a "causal relation to responsible authorities" is fatal to the relief sought where proof of such a relationship is wanting.

Plaintiffs' evidence here demonstrated at most an unfortunate insensitivity on the part of responsible officials toward reports of abuses by individual Troopers.[21] The department's apparent obliviousness to citizens' complaints [22] reinforces an impression of official indifference. Beyond these factors, however, and aside from the statistical number of incidents proved, there is no evidence of a causal link between, on the one hand, either the State Police hierarchy or any department-wide directive, and, on the other, the constitutional violations.

Indeed, any link between responsible officials and the incidents of abuse is necessarily more attenuated here than in *Rizzo*. Since the institution of this suit, the State of New Jersey, has appointed a new Attorney General, and the State has had three different Superintendents of Police. Plaintiffs' attempt to bridge this gap by affidavit [23] cannot mask the significance of these changes for *Rizzo* purposes. Where none of the incidents proved to the district court's satisfaction occurred under the regimes of the incumbent "responsible authorities"— the Attorney General and Superintendent of Police—we cannot find the concerted conduct against which large-scale injunctive relief might be directed.

■ The district court's findings of random acts on the part of a minority of Troopers, as well as its finding of "no deliberate pattern and practice" on the part of New Jersey officials, bring this case wholly within the doctrine of *Rizzo* for purposes of determining the propriety of injunctive relief. When we consider these findings, together with the circumstance that none of the charged and proved violations occurred under the regimes of the present responsible New Jersey authorities, it is evident that the district court was correct in denying injunctive relief, *Rizzo, supra* 423 U.S. at 377, 96 S.Ct. 598, and therefore must be affirmed in this respect.[24]

---

**21.** This insensitivity extended in several instances to departmental awards being conferred upon individual Troopers, named as defendants here, for their performance during the very time in which they instituted flagrantly illegal searches.

**22.** Counsel for appellees assured us at oral argument that departmental disciplinary steps against some of the named Troopers would be taken after resolution of this lawsuit. With the "obstruction" of this lawsuit removed, we trust that these departmental disciplinary actions will quickly be initiated.

**23.** *See* Affidavit of Morton Wolfson, October 16, 1974.

**24.** *Rizzo* itself says nothing concerning the propriety of injunctive relief against the individual Troopers in this case. However a review of the proceedings including the district court's findings that there existed no "substantial threat" of future violations by these Troopers, satisfies us that the district court judge did not abuse his discretion in denying an injunction against individual Troopers. That finding, combined with the difficulty of framing an injunction specific enough to be enforced, yet flexible enough to allow Troopers to respond with dispatch and certainty to the exigencies of their often-dangerous jobs, leads us to the same conclusion as that reached by the district court: that individual injunctions would be inappropriate on this record. The district court judge aptly observed in colloquy with counsel that it would hardly be appropriate "if everytime someone were stopped on the New Jersey Turnpike and had his car searched by a State Police Officer, or himself searched, he could gallop in here and seek to hold the officer in contempt." Transcript of Hearing of October 29, 1974, at 6. As counsel for plaintiffs responded, an order granting such injunctive relief "would create great difficulties for the Court." *Id.* Counsel for plaintiffs' were similarly hard pressed at oral argument before this Court, to suggest the manner in which such an injunction could be framed against individual Troopers.

Our agreement with the district court's refusal to grant individual injunctions should not be taken to mean that such relief could never be granted. The district court, after stating in its opinion that individual injunctive relief "would be inappropriate at this time," went on to say:

This does not mean, however, that the court would hesitate to shape such relief if future misconduct on the part of the named defendants is brought to its attention.

### III.

Although the district court judge refused to grant plaintiffs their requested injunctive relief—correctly, as our discussion above concludes—he went on to invite those named plaintiffs who had suffered constitutional deprivations at the hands of named Troopers to submit claims for compensatory damages. A consideration of this issue requires that we put the question of damages in its proper perspective.

The initial complaint filed by plaintiffs expressly sought only declaratory and injunctive relief. Paragraph I of that complaint refers only to " .  .  . an action seeking declaratory and injunctive relief." Part VI of the complaint, the prayer for relief, in Paragraph 1 seeks a declaratory judgment; in Paragraph 2, a preliminary and prohibitory injunction; in Paragraph 3, a preliminary and mandatory injunction; and in Paragraph 4, a preliminary and permanent injunction prohibiting prosecutions. Paragraph 5 asks the court to retain jurisdiction, and Paragraph 6, the final paragraph, requests "that the court issue any further relief that it deems just and reasonable."

The answer of the defendants included as an affirmative defense the doctrine of unclean hands, which doctrine, if established, would preclude equitable relief. None of the proceedings or subsequent pleadings ever adverted to or addressed the damage issue or legal damages. Rather, the overall nature of the proceeding was at all times recognized by the parties, by the various district court judges, and by this Court, as strictly equitable in character.

After this Court's remand in *Lewis v. Kugler. supra,* plaintiffs amended their complaint, but that amendment did not al-

ter the essential equitable character of the proceeding. Thereafter, the stipulations into which the parties entered permitted the case to be heard on the record as developed during the preceding years. During all of this time, the plaintiffs never asserted that they were seeking legal damages. The primary thrust of, and indeed the only relief sought by the plaintiffs was the issuance of injunctions against the practices of the State Troopers.

It was in this setting that the district court rendered its opinion of November 13, 1975, which held that injunctive relief was unavailable and which for the first time indicated that money damages could be obtained against individual Troopers. It is immaterial whether this issue surfaced because the district court judge sensed the inequity of sending plaintiffs away empty handed despite their proof of unconstitutional searches, or because he misconceived the remedies required by *Lewis v. Kugler.*[25] What is material is that just before closing its opinion the district court stated:

> The question of money damages remains. Such damages are appropriate in actions brought under 42 U.S.C. § 1983. *Fisher v. Volz,* 496 F.2d 333, 346–347 (3d Cir. 1974). Those named plaintiffs whose Fourth Amendment rights were violated may apply to the court within 30 days of the date of this opinion for a hearing date for assessment of money damages. Such damages will be awarded where legally possible.

While we recognize the general availability of damages in a § 1983 action where damages have been sought and have been in issue between the parties,[26] we have great difficulty in countenancing the district court's decision to award damages in the

**25.** The award of damages was said to be responsive to our earlier remand in *Lewis v. Kugler, supra.* While we sympathize with the district court's desire to afford plaintiffs some remedy in lieu of equitable relief, nothing in our earlier remand can be read to require an award of damages. Indeed, the authority which the district court relied upon (footnote 17, 446 F.2d at 1351) speaks only in terms of a remedial order. Moreover, this observation in our opinion followed a discussion, which *negated* the effectiveness of a damages remedy for police misconduct. *See id.* at 1350.

**26.** *See Curtis v. Loether,* 415 U.S. 189, 194–96, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Chapman v. Kleindienst,* 507 F.2d 1246 (7th Cir. 1974); *Ford v. Breier,* 71 F.R.D. 195, 197 (E.D.Wis. 1976).

manner in which it did, after the case was, for all intents and purposes, at a close.

First, substantiating our belief that no damages had ever been contemplated by the parties, it is significant to us that the plaintiffs themselves recognized that an amendment to their complaint would be required to crystallize the money damages issue and to support a money damages award. Accordingly, on December 16, 1975, just weeks after the district court's opinion was announced, the plaintiffs sought to amend their complaint to provide for compensatory and punitive damages.

The defendants, on the other hand, apparently not having contemplated other than equitable defenses, thereupon sought a jury trial for those defendants against whom damages claims were to be asserted. This in turn led to additional motions: the plaintiffs sought to amend their complaint to designate additional party-defendants; the defendants, on the other hand, sought to raise still other defenses.

On December 29, 1975, the district court judge filed his memorandum opinion in which he assessed a total of $600 damages for reasonable compensation.[27] Thereafter, on January 14, 1976, a final order was entered in this case, which, among other provisions, denied the defendants a jury trial, denied plaintiffs their amendments to the complaint, and reflected the damage awards which we have recited. As earlier indicated, it was from that order that this appeal was taken.

Any fair reading of the protracted proceedings in this case must lead to the following conclusions:

(1) that the plaintiffs at no time until after the November 1975 opinion denying injunctive relief ever intended to seek legal damages;

(2) that throughout these proceedings the defendants never contemplated the possibility of money damages being awarded against them;

(3) that, had damages been contemplated, appropriate pleadings and proceedings, including discovery, would have been utilized;

(4) that, with damages as a possibility, a jury demand would probably have been made prior to the district court's opinion by one, if not both, parties;

(5) that the parties were content to try the case as an action for equitable relief; and

(6) that it was not until the district court judge injected the question of damages into the case that this issue entered into the thinking of the parties.

In such circumstances, and particularly in light of the seven-year history of this litigation, we are not about to interpret the catch-all phrase "and such other relief . . . ." to include a claim for legal damages. Cf. *Crane Co. v. American Standard, Inc.,* 490 F.2d 332, 341–83 (2d Cir. 1973).[28] While we do concede that in many circumstances that phrase may be so read, we decline to give it that content here.

We also decline to consider the damages awarded as incidental to equitable relief. Indeed, we note that in *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), a case involving Section 812 of the Civil Rights Act of 1968 (42 U.S.C. § 3612), the Supreme Court said:

if [a] legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact. *The right*

27. Plaintiff Stuart Ball was awarded $100 against Trooper Peter Hook; plaintiff Jeffrey Fogel was awarded $100 against Trooper Hook; plaintiff George Lewis was awarded $150 against Trooper John Tanner; and plaintiff Jesse Berman was awarded $250 against Trooper Russell Hawke.

28. In *Crane,* the Court · of Appeals for the Second Circuit concluded that the right to a jury trial was abrogated when a suit for purely equitable relief against a merger was transformed into a suit for damages by the merger's consummation. That case, of course, involved federal securities law, rather than §. 1983. Moreover, its result rests upon changed factual circumstances not present here. (Plaintiffs here certainly were free to seek legal as well as equitable damages in framing their initial complaint.)

*cannot be abridged by characterizing the legal claim as "incidental" to the equitable relief sought.*

415 U.S. at 196 n.11, 94 S.Ct. at 1009, citing *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 470–73, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). In any event, the equitable relief sought by the plaintiffs has not been afforded here.

This leaves as a last alternative the possibility of returning the case to the district court for jury proceedings in connection with the plaintiffs' claims. In normal course, this might well have been the direction which we would take. However, as we earlier emphasized, this case was never started or structured as a § 1983 damage action. As the district court judge said in *United States v. Pelzer Realty Co.,* 377 F.Supp. 121, 123 (M.D.Ala.1974), *aff'd per curiam,* 537 F.2d 841 (5th Cir. 1976):

> While damages, even nominal damages, are proper relief for a violation of the [Civil Rights Act of 1968], in the opinion of this Court, an award of damages, where none were prayed for or specifically proved and when the plaintiffs gave the Defendants no hint that damages were to be litigated so that the Defendants might litigate the issue or consider demanding a jury, would be a strange twist of the law in order to accommodate the Plaintiff.

A remand for a jury trial within the framework of the instant case would in our mind torture this entire litigation into a proceeding vastly different than either party had ever intended or contemplated. Such a remand would also require that additional proceedings take place after final disposition of those issues which had legitimately been litigated, which had been considered by the various district court judges and by this Court, and which had been ultimately resolved on a stipulated record.

While we obviously have no objection to any independent proceeding which may have been or which still may be brought by a plaintiff to vindicate his constitutional rights (by an award of damages) we do not believe that the instant proceeding is the appropriate vehicle by which to achieve that purpose.[29] Accordingly, we are of the view that the district court's eleventh-hour introduction of the money damages issue in its disposition of the relevant issues in this case exceeded its permissible discretion.

### IV.

Having given careful consideration to the various other contentions on appeal of the parties, and having concluded that they are without merit, we will affirm the district court's order of January 14, 1976 in all respects except its award of damages. For the reasons which we have specified in Part III of this opinion, we will direct that, in this latter respect, so much of the district court's order as awarded damages to plaintiffs Ball, Fogel, Berman, and Lewis and against Troopers Hook, Hawke and Tanner be vacated.

### V.

So that our holding is not misunderstood, we emphasize that we have not held that an injunction against police abuses will never lie. Nor have we held that damages against police officers are unavailable under § 1983.

What we hold here is that *in this case,* absent proof of affirmative involvement in a pattern and practice of constitutional violations by supervisory officials, injunctive relief may not issue against them. We also hold that, on this record, an injunction would be inappropriate as to the named Troopers. Further, given this record and the manner in which this case was structured by the pleadings, damages that were never sought by the plaintiffs prior to the

---

**29.** We again note the fact that the district court judge who awarded damages was the fourth district court judge assigned to this case and that by reason of the stipulated record, at no time had the benefit of having the plaintiffs and the defendants testify before him. While we do not hold that this factor precludes an award of damages in an appropriate case, we cannot ignore it here.

district court's dispositive opinion of November 13, 1975 may not be awarded.

### VI.

Having affirmed in part and reversed in part, we will remand to the district court for the entry of an appropriate order consistent with this opinion.