Jerry EVENSON, dba World News Syndicate, World News Beat, and Bachelor's Beat Newspapers, Plaintiff,

v.

Ruben ORTEGA, in his official capacity as Chief of Police of the City of Phoenix, et al., Defendants.

No. Civ. 84–150 PHX PGR.

United States District Court, D. Arizona.

March 27, 1985.

Richard J. Hertzberg, Phoenix, Ariz., for plaintiff.

Brian Ross Hauser, Deputy Co. Atty., Phoenix, Ariz., for defendants.

## OPINION AND ORDER

ROSENBLATT, District Judge.

The plaintiff herein publishes a newspaper entitled "Bachelor's World News Beat". The sheriff of Maricopa County, Jerry Hill, and several of his deputies are the defendants.[1] In November, 1982, the Maricopa County Sheriff's Department, working through an undercover officer placed an advertisement in plaintiff's newspaper. The advertisement was part of an undercover investigation of prostitution. The sheriff's department advertised an "escort service" in the belief that many advertised escort services are fronts for prostitution. In fact, from responses to their advertisement, the defendant made numerous arrests and obtained convictions of persons soliciting acts of prostitution or engaging in a conspiracy to commit acts of prostitution.

The plaintiff seeks to enjoin the defendants from placing any other similar advertisements in his newspaper. The defendants have not agreed to refrain from placing such advertisements because they believe it to be a legitimate law enforcement technique. The complaint in this action originally sought damages and injunctive relief. To avoid statute of limitation problems, the claims for damages were dismissed with prejudice pursuant to stipulation of the parties.

The plaintiff requires that all persons who place an advertisement in his newspaper sign an affidavit which states:

BE IT KNOWN, that I/we, the undersigned, do hereby certify and guarantee that any advertising placed by or for us in any of the publications of or affiliated with World News Syndicate, are not intended or being used for any illegal purposes, and are accepted and published ONLY FOR THE PURPOSES CONTAINED THEREIN. Further, it is stipulated that the making of this affidavit is only required by the publisher due to the numerous allegations and charges leveled at certain individuals and business (sic) by various media and government agencies or individuals. Signing of, or request that same be signed, shall not in any way impugn the integrity or purposes of the undersigned or his/her agents or employees with regard to the advertising placed or the nature of the business or services so advertised. Further, I/we are not employed, retained or in other ways instructed or encouraged by any governmental agency to place said advertising.

The affidavit signed by the deputy sheriff who placed the advertisement was, of course, false.

■ The plaintiff's position is that he does not want his newspaper to be used for law enforcement purposes without his knowledge and consent. He disapproves of the use of a sting operation to ensnare persons who call his advertisers and of the practice of publishing in the Phoenix Gazette the names of persons arrested for

---

1. The complaint lists as the first defendant Ruben Ortega, Chief of Police for the City of Phoenix. He was later dismissed from the case.

solicitation. He believes that the practice is unreasonably destructive of reputations and families and does not want his newspaper in any way involved in the practice.[2]

Plaintiff has apparently had an on-going battle with the defendants about advertisements run in his newspaper. They have notified him in the past about persons under investigation for prostitution and requested that he cease running their advertisements. Plaintiff takes the position that he will refuse to run an advertisement for anyone who has been convicted, but will not refuse advertisements merely because someone is under investigation by law enforcement officials.

Plaintiff asserts herein that he has an absolute First Amendment right to determine what is published in his newspaper and he cannot be compelled to publish things, by deception or otherwise, that he does not wish to publish. *Cf. Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). Further he argues that he could be subjected to liability under the consumer fraud act for publishing false and deceptive advertising.

The defendants argue that their use of the plaintiff's newspaper is a legitimate law enforcement technique. It does not impinge substantially on plaintiff's First Amendment rights because it relates solely to commercial speech. They have done nothing to interfere with the editorial content of the newspaper. In fact, plaintiff has published an article condemning the defendants and the advertisement in question. Furthermore, the defendants argue that the plaintiff should not be allowed to use the First Amendment to shield his readers from prosecution. The defendants argue that the plaintiff routinely accepts advertisements from other advertisers (escort services and massage parlors) that are fronts for prostitution and who do not reveal their true purposes and/or identities.

They argue that what plaintiff seeks to protect is a consistent level of falsity.

■ The plaintiff is correct that as a general proposition, a publisher cannot be compelled to print anything that he does not wish to print. *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). *Tornillo* is the leading case in this area. In that case, the Supreme Court invalidated a Florida statute that required a newspaper to provide space for a reply to any political candidate whose personal character or official record has been assailed in the newspaper. The Supreme Court noted that its prior opinions had

> expressed sensitivity as to whether a restriction or requirement constituted the compulsion exerted by government on a newspaper to print what it would not otherwise print. The clear implication has been that any such compulsion to publish that which reason tells them should not be published is unconstitutional. A responsible press is an undoubtably desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated.

*Id.* at 256, 94 S.Ct. at 2838

> A newspaper is more than a passive receptacle for news, comment and *advertising.* The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute editorial control and judgment. (emphasis added).

*Id.* at 258, 94 S.Ct. at 2839. Government should not intrude into this area. *Id.*

This unbridled editorial discretion has been held to extend to commercial advertising. *Mississippi Gay Alliance v. Goudelock,* 536 F.2d 1073, 1949 (5th Cir.1976), *cert. denied,* 430 U.S. 982, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977) (a student newspaper

---

**2.** The Court will not comment on the propriety of this policy. It cannot however, form the basis for injunctive relief in this case. Interjecting this Court's opinion on that practice would be precisely the sort of governmental interference with editorial judgment that the First Amendment clearly prohibits.

rejected an advertisement submitted by an off-campus homosexual group); *Associates & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133 (9th Cir.1971) (The Los Angeles Times altered an advertisement for the movie The Killing of Sister George) (cited with approval by Supreme Court in *Tornillo*); *Chicago Joint Bd. Amalgamated Clothing Workers of Am. v. Chicago Tribune Co.*, 435 F.2d 470 (7th Cir.1970), *cert. denied*, 402 U.S. 973, 91 S.Ct. 1662, 29 L.Ed.2d 138 (1971) (four Chicago newspapers refused to publish a union's advertisement intended to communicate its opposition to the sale of imported foreign-made clothing); *Person v. New York Post Corp.*, 427 F.Supp. 1297. (EDNY), *aff'd*, 573 F.2d 1294, (2d Cir.1977) (the New York Post rejected a "tombstone advertisement" submitted by an attorney who sought to sell shares in a lawsuit); *Modla v. Tribune Publishing Co.* 14 Ariz.App. 82, 480 P.2d 999 (1971) (newspapers rejected plaintiff's real estate ads); *Fiorino v. Globe Newspaper Co.*, 5 Media L.Rep. (BNA) 1988 (Mass. Super.Ct.1979) (the Boston Globe rejected an advertisement for a placement service); *Newspaper Printing Corp. v. Galbreath*, 580 S.W.2d 777 (Tenn.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979) (a newspaper refused to accept an advertisement for a rental apartment unless certain modifications were made); *Wisconsin Assn. of Nursing Home, Inc. v. Journal Co.*, 92 Wis.2d 709, 285 N.W.2d 891 (Ct.App.1979) (two Milwaukee newspapers rejected an ad by a nursing home association intended to refute investigative articles on nursing homes published by the newspapers). *See generally*, S. Metcalf, *Rights and Liabilities of Publishers, Broadcasters and Reporters*, Sec. 7.04 n. 1 (1982). This is true unless the refusal to advertise results in a violation of another statute such as the Sherman Act; *See Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Home Placement Service, Inc. v. Providence Journal Co.*, 682 F.2d 274 (1st Cir. 1982) *cert. denied* 459 U.S. 903, 103 S.Ct. 203, 74 L.Ed.2d 163 (1982); results in unconstitutional discrimination, *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (newspaper could not group advertisements for jobs under gender classes that would perpetuate gender discrimination in employment); *Pines v. Tomson*, 160 Cal.App.3d 370, 206 Cal.Rptr. 866 (1984) (Christian Yellow Pages could not refuse to publish advertisements for non-Christian businesses as a means to facilitate discrimination in patronage by Christians in favor of Christians); or is a breach of contract with the advertiser.

This case is unlike any of the other cases found where the rights of the advertisers have been considered in light of the First Amendment. In one such group of cases, the plaintiffs are advertisers suing to force a newspaper or other media to accept their advertising. *E.g., Associates & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133 (9th Cir.1971); *Chicago Joint Board, Amalgamated Clothing Workers of America v. Chicago Tribune Co.*, 435 F.2d 470 (7th Cir.1970) *cert. denied* 402 U.S. 973, 91 S.Ct. 1662, 29 L.Ed.2d 138 (1971). This Court would have no difficulty determining that the defendants herein would not be entitled to a mandatory injunction to force publication of their advertisement; but that is not to say that the plaintiff is necessarily entitled to an injunction to prevent the placement of the advertisement.

Another such class of cases involves the rights of the government to regulate commercial speech and advertising. The First Amendment does not provide absolute protection for commercial speech. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976). The states right to regulate depends on a balance of interests; the public interest in regulation versus the public good of an unencumbered press. In *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65

L.Ed.2d 341 (1980), the Supreme Court adopted a four part analysis for assessing the validity of restrictions on public advertising. The Court must determine whether the speech is constitutionally protected. For speech to receive any protection it must concern a lawful activity and not be misleading. The governmental interest must be substantial and the regulation must directly advance the governmental interest asserted. The Court must determine whether the regulation is more extensive than is necessary to serve that interest. *Id.*

The defendant has noted that undercover operations have generally been accepted by the courts. The Supreme Court pointed out in *Lewis v. United States*, 385 U.S. 206, 209–210, 87 S.Ct. 424, 426–427, 17 L.Ed.2d 312 (1966) that the government is entitled to use deceptions, decoys and to conceal the identity of the agents to combat criminal activity. The laws against many types of criminal activities, including prostitution (vice) would be nearly impossible to enforce without undercover investigation. *Id.* at 210, 87 S.Ct. at 427. Therefore, it is necessary for the law to distinguish between those deceits which are permissible and those that are not. *Id.* at 210 n. 6, 87 S.Ct. at 427 n. 6. The propriety of deception by police is often judged by whether the person deceived appeared inclined to do the same act were it not for the deception. *Cf. LaFave, Search and Seizure*, Sec. 8.2(n) (1978). A review of several issues of the plaintiff's newspaper reveal many advertisements substantially similar to that placed by the defendants. This demonstrates that the plaintiff would have been likely to accept the advertisement but for the deception and the law enforcement purpose.

Only one remotely similar case was found where the plaintiff's First Amendment rights were allegedly being violated by the use of undercover investigation or surveillance. In *Socialist Workers Party v. Attorney General of the United States*, 419 U.S. 1314, 95 S.Ct. 425, 42 L.Ed.2d 627 (1974), the plaintiff sought to enjoin the FBI from sending FBI undercover agents and informants to the national convention of the Young Socialist Alliance. The surveillance, plaintiff argued would chill free participation and debate and might discourage attendance. The District Court granted a preliminary injunction, but the Court of Appeals reversed because they believed that the plaintiffs had not sufficiently established that any harm would come from the surveillance and that the injunction would compromise the government informants. The appellate court held that there was insufficient evidence in the record to justify the extraordinary relief of a preliminary injunction barring investigation by the FBI. Justice Marshall, acting as circuit justice, was asked to stay the decision of the Court of Appeals and reinstate the preliminary injunction granted by the District Court. Marshall decided that the circumstances were not such as would justify the extraordinary relief requested. He noted that

> governmental surveillance and infiltration cannot in any context be taken lightly. The dangers inherent in undercover investigation are even more pronounced when the investigative activity threatens to dampen the exercise of First Amendment Rights. See *DeGregory v. New Hampshire Atty. Gen.*, 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966); *Gibson v. Florida Legislative Comm.*, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). But our abhorrence for abuses of governmental investigative authority cannot be permitted to lead to an indiscriminate willingness to enjoin undercover investigation of any nature, whenever a countervailing First Amendment claim is raised.

419 U.S. at 1319, 95 S.Ct. at 428.

Here the question is whether a permanent injunction should issue under the injunctive authority provided in Sec. 1983 of the Civil Rights Act which permits this Court to enjoin activities that violate the constitutional rights of a citizen. This Court has found no authority, and the plaintiff has not cited any, that would per-

mit this Court to enjoin the defendants from otherwise lawful investigative techniques even if this Court were to find that the practice violates the plaintiff's right to publish his newspaper free from governmental intrusion.

■ An injunction is an extraordinary remedy and is never lightly dispensed by a federal court. This is even more the case when the parties seek an injunction that would impose upon the sovereignty of a state in the exercise of its police power or law enforcement efforts. *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed. 561 (1976); *Wilson v. Webster*, 315 F.Supp. 1104 (D.Cal.1970) *vacated on other grounds*, 467 F.2d 1282 (9th Cir.1972). That is precisely the kind of extraordinary relief that the plaintiff seeks. "Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and state administration of its own law." *Rizzo v. Goode* 423 U.S. at 378, 96 S.Ct. at 607, *quoting in part, Stefanelli v. Minard*, 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed. 138 (1951). This Court does not believe that the plaintiff has adequately established that it is entitled to such an injunction.

■ Injunctions under Sec. 1983 are governed by traditional principles of equity, *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed. 561 (1976), and several equitable principles support this conclusion. First the Court has substantial discretion in whether to issue an injunction. *Lemon v. Kurtsman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973); *Brown v. Board of Educ. of City of Chicago*, 386 F.Supp. 110 (N.D.Ill.1974); *Wilson v. Webster*, 315 F.Supp. 1104 (D.Cal.1970) *vacated on other grounds*, 467 F.2d 1282 (9th Cir. 1972). An injunction will not issue if the equities do not favor the party requesting the injunction. *See Id.* Furthermore, it will not issue if the injunction would not be in the public interest. *Cf. Brown v. Board of Education*, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955). Finally, the traditional requirements that the plaintiff demonstrate irreparable injury and lack of adequate remedy at law remain. *Allee v. Medrano*, 416 U.S. 802, 814, 94 S.Ct. 2191, 2200, 40 L.Ed. 566 (1974).

■ Given these principles, it is appropriate for this Court to look at the countervailing interests presented by the parties. The plaintiff has a First Amendment interest in publishing only what he chooses and in not being compelled by the government to publish things that he disapproves of. The injury to the plaintiff, however, appears to be slight. There is no intrusion on the editorial content of the newspaper, and in fact he has used the paper to protest the defendants' use of sting operations. *See* Exhibit 2E. No property interest has been damaged. There is no evidence that the plaintiff will lose any revenue from the acts of the sheriff. It may be that persons who were prosecuted for prostitution or solicitation as a result of having responded to the sheriff's advertisement may not continue to purchase the plaintiff's newspaper. However, if the newspaper is purchased solely in search of prostitution services, no protectible interest is involved. The First Amendment does not protect the right to advertise prostitution free from governmental interference. The state clearly could prohibit the direct advertisement of prostitution services. *Pittsburgh Press*, 413 U.S. at 388, 93 S.Ct. at 2560. The plaintiff has argued that the advertisements placed by the defendants will injure his reputation and injure his readers' trust in his newspaper. No explanation is offered for these assertions and no evidence in the record supports them. The plaintiff has made no effort to establish that his remedies at law are inadequate.[3]

■ On the other side the state has an interest in enforcing the laws against pros-

---

3. The fact that legal remedies may be foreclosed by a statute of limitations does not make the remedy inadequate.

titution and solicitation. There is evidence before the Court that the advertisement in question promoted that interest by providing evidence leading to convictions. This Court cannot say, on the record before it, that this means of enforcement is not sufficiently successful to be warranted. Nor can this Court substitute its judgment for that of the law enforcement officers by forcing them to use what is arguably a less restrictive alternative. The parties have simply not provided this Court with evidence that would support such a ruling. It should be noted that this Court is not sanctioning this method of investigation. It appears that there are other means to investigate prostitution that may be advertised surreptitiously in the plaintiff's newspaper that would not impinge on the plaintiff's First Amendment rights. The defendants have apparently had investigative success by merely following up on the advertisements placed in the plaintiff's newspaper. But the fact that there are alternative investigative techniques, does not necessarily entitle the plaintiff to an injunction.

■ Another equitable principle that mitigates against relief is that an injunction should not issue unless there is substantial evidence of impending injury. *Tara Enterprises, Inc. v. Humble*, 622 F.2d 400 (8th Cir.1980); *Lewis v. Hyland*, 554 F.2d 93 (3rd Cir.) *cert. denied* 434 U.S. 931, 98 S.Ct. 419, 54 L.Ed.2d 291 (1977); *Wilson v. Webster*, 467 F.2d 1282 (9th Cir. 1972). Aside from the fact that the Sheriff has not promised to refrain from placing any future advertisements, there is little evidence that the practice complained of is likely to recur. The sheriff Jerry Hill, is no longer in office.

■ Finally, the Court is required, if it is to issue an injunction at all, to issue one which is neither too broad to be warranted by the facts, nor too narrow to protect the interests involved. It must set forth the prohibited activity with specificity so that the person or persons enjoined know exactly what is prohibited. *Lewis v. Hyland*, 554 F.2d 93 (3rd Cir.) *cert. denied* 434 U.S.

931, 98 S.Ct. 419, 54 L.Ed.2d 291 (1977); *Wilson v. Webster*, 315 F.Supp. 1104 (D.Cal.1970) *vacated on other grounds*, 467 F.2d 1282 (9th Cir.1972). This is virtually impossible to do in this case. Any injunction would be too broad, too narrow, or would require a factual comparison in the attempted enforcement.

■ This ruling should not be read to prevent the plaintiff from refusing any advertisement from the defendants that he becomes aware of. He may use any legal means at his disposal to determine whether an advertisement is being placed deceptively by law enforcement officers so that he may refuse to run it. This Court simply holds that the plaintiff has not established that he is entitled to the assistance of an injunction in that effort.

*Consumer Fraud Act*

■ Another basis upon which the plaintiff seeks relief is that the defendant's misleading advertisements might subject him to liability under the Consumer Fraud Act, 44 A.R.S. Sec. 1521 et seq. Sec. 1522 A states as follows:

A. The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has been misled, deceived or damaged thereby, is declared to be an unlawful practice.

Sec. 1531 imposes criminal penalties for wilfull violation of this section. Plaintiff argues that permitting publication of the defendants' false and misleading advertisements might subject him to liability under these provisions.

The defendant points out that Sec. 1523 explicitly excepts from liability any newspaper who publishes an unlawful advertisement without knowledge of the intent or purpose of the advertiser. Plaintiff claims,

however, that under these circumstances, he may never be truly without knowledge of the defendants' activities.

It seems doubtful that the Arizona courts would interpret this section such that undercover activities by police officers would fall within the parameters of the Act. As a consequence, it is unreasonable to assume that the plaintiff, who did nothing but publish the advertisement, could be held liable for the deception, and this Court will not rely on such a strained interpretation of the law as grounds to enjoin otherwise legitimate law enforcement activity. Furthermore, it seems unlikely that any reader would sue the plaintiff after having been deceived by the defendants' advertisement. Such a remote possibility does not bear much weight in the resolution of this litigation.

*Conclusion*

Based upon the reasoning and policy considerations discussed herein; IT IS ORDERED that the Plaintiff's Motions for Summary Judgment are DENIED and the Defendants' Motion for Summary Judgment is GRANTED.