George FALTER, Robert Mahler, William Hilbert, Joseph Scaffuto, John Sousa, and Eugene Madgett, suing Individually and on behalf of all others similarly situated Plaintiffs,

v.

The VETERANS ADMINISTRATION, an agency of the Government of the United States; Max Cleland, Administrator, Veterans Administration, John Chase, M.D., Director, Department of Medicine and Surgery of the Veterans Administration; Ernest Shacklett, M.D., Director, Veterans Administration, Medical District Number 10–CA–4; Carl M. Mikail, Director, Veterans Administration Medical Center at Lyons, New Jersey; Howard D. Cohn, M.D., Chief of Staff of the Veterans Administration Medical Center at Lyons, New Jersey; J.B. Dodman, R.N., Director of Nursing Home Care Unit at the Veterans Administration Medical Center at Lyons, New Jersey and the United States of America, Defendants.

Civ. No. 79–2284 (JWB).

United States District Court,
D. New Jersey,
Civil Division.

Jan. 31, 1986.

See also, D.C., 502 F.Supp. 1178.

William F. Culleton, Deputy Public Advocate, Trenton, N.J., for plaintiffs.

Anne C. Singer, Paul A. Blaine, Asst. U.S. Attys., Newark, N.J., for defendants.

## OPINION

BISSELL, District Judge.

This is a class action brought by George Falter, Robert Mahler, William Hilbert, Joseph Scaffuto, John Sousa and Eugene Madgett on behalf of all patients at Lyons Veterans Administration Medical Center (Lyons) to redress certain alleged grievances. The defendants are The Veterans Administration (V.A.); Max Cleland, Administrator, Veterans Administration; John Chase, M.D., Director, Department of Medicine and Surgery of the Veterans Administration; Ernest Shacklett, M.D., Director, Veterans Administration; Carl M. Mikail, Director of Lyons; Howard D. Cohn, M.D., Chief of Staff of Lyons; J.B. Dodman, R.N., Director of Nursing Home Care Unit of Lyons; and the United States of America. No claims for money damages are asserted; only injunctive relief is sought for benefit of the class as a whole or for certain readily identifiable segments thereof. After extensive pretrial proceedings, the case went to trial upon allegations of defendants' conduct which plaintiffs assert is of such magnitude as to violate one or more of their rights under the Constitution of the United States. After a lengthy presentation of their case, plaintiffs rested, whereupon defendants moved for judgment pursuant to *Fed.R.Civ.P.* 41(b). Because of the extensive testimonial and documentary evidence, the Court required that defendants' motion be set forth in writing and that the briefs on both sides contain specific citations to the record. Having received such materials, the Court is prepared to adjudicate defendants' motions.

## I. THE SCOPE OF THE COURT'S REVIEW ON THE PRESENT MOTION

As relevant, *Fed.R.Civ.P.* 41(b) reads as follows:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the

law the plaintiff has shown no right to relief. *The court as trier of the facts may then determine them* and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). [Emphasis added].

■ It is now settled law that a judge, as trier of the facts, should critically evaluate plaintiffs' evidence pursuant to a Rule 41(b) motion. *E.g., Emerson Electric Company v. Farmer*, 427 F.2d 1082 (5th Cir.1970). When such a motion is filed, the judge must weigh and evaluate the evidence in the same manner as though he were making findings of fact at the conclusion of the entire case, according it such weight as he believes it is entitled to receive. A mere *prima facie* showing by a plaintiff will not withstand a defense motion under Rule 41(b). *E.g., Ellis v. Carter*, 328 F.2d 573, 577 (9th Cir.1964). Subsequent to the adoption in 1946 of amendments to Rule 41(b) which added the last two sentences quoted above, it is clear that "the Court is not to make any special inferences in plaintiffs' favor, nor concern itself with whether plaintiff has made out a prima facie case. Instead, it is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." 9 Wright & Miller, *Federal Practice and Procedure:* Civil. § 2371 at 224–225 (1971) (footnotes omitted).

The Third Circuit now accepts the distinction between directed verdict motions in jury trials and motions to dismiss in non-jury cases.

In *O'Brien v. Westinghouse Electric Corporation*, 293 F.2d 1 (3d Cir.1961), a jury case, the Court, in dictum, clearly distinguished between a motion to dismiss in non-jury trials and a motion for directed verdict in jury trials:

It is clear a motion under Rule 41(b) for dismissal at the end of plaintiff's case, that upon the facts and the law the plaintiff has shown no right to relief, is proper in a case without a jury. Upon granting such a motion the court should make findings of fact and conclusions of law pursuant to Rule 52(a). Upon review the findings must be accepted unless clearly erroneous. It is equally clear that in a jury case the question only can be one of law.

293 F.2d at 9. *See also Kahn v. Massler*, 241 F.2d 47, 48 (3d Cir.1957) and *Bateman v. Ford Motor Company*, 310 F.2d 805, 807 (3d Cir.1962).

Indeed, district courts within the Third Circuit now uniformly recognize that pursuant to a Rule 41(b) motion, they "need not view the evidence in a manner most favorable to the plaintiff, but instead must weigh it, deciding issues of fact and credibility." *Dickerson v. United States Steel Corporation*, 439 F.Supp. 55, 63–64 (E.D. Pa.1977); *see also Beissinger v. Rockwood Computer Corp.*, 529 F.Supp. 770, 775 n. 4 (E.D.Pa.1981); *Sworob v. Harris*, 451 F.Supp. 96, 99 (E.D.Pa.), *aff'd mem.*, 578 F.2d 1376 (3d Cir.1978), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979); *Pan American World Airways, Inc. v. Continental Bank*, 435 F.Supp. 642, 643 n. 1 (E.D.Pa.1977).

■ Thus, a motion to dismiss in a non-jury trial is very different than a motion for a directed verdict in a jury trial. As the plain language of Rule 41(b) itself indicates, the Court in a non-jury trial has not only the right, but the duty to examine the credibility of witnesses and to weigh the evidence on such a motion. In short the Court is called upon to adjudicate the case on the merits, and need not consider plaintiffs' evidence in the light most favorable to them, as required in a jury trial.

## II. BASIC PRINCIPLES GOVERNING THE GRANTING OR DENIAL OF INJUNCTIVE RELIEF

■ Injunctive relief is an extraordinary remedy, not to be granted absent a finding of irreparable injury, not compensable by adequate remedies at law, and a real or immediate threat that plaintiffs will be

wronged again. One major treatise on federal civil procedure has stated the following in this regard:

> There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing [of] an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. The right must be clear, the injury impending or threatened, so as to be averted only by the protecting preventive process of injunction: but that will not be awarded in doubtful cases, or new ones, not coming within well established principles; for if it issues erroneously, an irreparable injury is inflicted, for which there can be no redress, it being the act of a court, not of the party who prays for it.

11 Wright & Miller, *Federal Practice and Procedure:* Civil § 2942 at 369 (1973) (quoting *Bonaparte v. Camden,* 3 Fed.Cas. 821, 827 (No. 1,617) (C.C.D.N.J.1830)).

■ Injunctive relief must not be awarded merely to assuage fears of what may happen in the future, *e.g., Roseboro v. Fayetteville City Board of Education,* 491 F.Supp. 110, 112 (E.D.Tenn.1977); or be based upon speculative determinations of what may happen in the future, *e.g., Bradley v. Detroit Board of Education,* 577 F.2d 1032, 1035 (6th Cir.1978). The mere possibility of future misconduct is not enough, *e.g., Reporters Committee for Freedom of the Press v. American Telephone & Telegraph Co.,* 593 F.2d 1030, 1064–65 (D.C.Cir.1978), *cert. denied,* 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979). Rather, the harm must be threatened or imminent, and must be such that there is no adequate remedy in damages. *E.g., Detroit News Pub. Assn. v. Detroit Typo. Union,* 471 F.2d 872, 876 (6th Cir. 1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973). As the Third Circuit has stated:

> We must protect that which is protectable, but, in so doing, we must limit the use of injunctive relief to situations where it is necessary to prevent immediate and irreparable injury. The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat; it may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights....

*Holiday Inns of America v. B & B Corp.,* 409 F.2d 614, 618 (3d Cir.1969).

Against this long-standing set of basic principles governing the issuance of injunctions, clear-cut legal standards have recently emerged as to when injunctive relief based on claimed constitutional violations by governmental entities or agencies is appropriate.

■ Succinctly stated, an injunction against particular conduct in such a setting will lie only where a plaintiff establishes that such conduct is virtually universal in practice or is codified, authorized or uniformly acquiesced in by the government entity or its top management. As stated by the U.S. Supreme Court in *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (with reference to the particular claims of that case) an injunction was inappropriate because plaintiff therein failed to establish either "that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter" or "that the City ordered or authorized police officers to act in such a manner." *Id.* at 106, 103 S.Ct. at 1667 (emphasis in original). *Accord Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). *Compare Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) where administrators by their own actions had denied constitutional rights.

In *Lewis v. Hyland,* 554 F.2d 93 (3d Cir.), *cert. denied,* 434 U.S. 931, 98 S.Ct. 419, 54 L.Ed.2d 291 (1977), the Third Circuit followed *Rizzo,* holding that absent proof of

affirmative involvement of supervisory police officials in a plan or scheme to suppress constitutional rights, injunctive relief may not issue against them. The district court (Judge H. Curtis Meanor) had found *34 clear violations* of Fourth and Fourteenth Amendment rights by individual police officers, yet had denied injunctive relief.[1] "The number of incidents of police abuse ... even extrapolating beyond those proved ... paled in comparison with the overwhelming number of routine contacts between Troopers and travelers." 554 F.2d at 97. The problem, the trial judge said, lay in the willful and random acts of a minority of troopers, not in any deliberate pattern and practice by responsible officials. The Third Circuit affirmed the district court's denial of an injunction, finding that *Rizzo's* focus was on the absence of any evidence of participation by the named defendants in a plan or scheme to suppress constitutional rights. So saying, the Third Circuit followed the requirements of *Rizzo* that a mere failure to act by responsible authorities in the face of a statistical pattern provides no basis for injunctive relief. Absent the required causal relationship linking the illegal actions taken to responsible authorities, no injunction can be issued.

Similar language has been used concerning injunctive relief sought in institutional settings. In *Rennie v. Klein*, 476 F.Supp. 1294, 1308–09 (D.N.J.1979), *modified on other grounds*, 653 F.2d 836 (3d Cir.1981) *en banc, vacated on other grounds*, 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982), *on remand*, 720 F.2d 266 (3d Cir. 1983) this Court, discussing the appropriate Supreme Court precedent, determined that isolated incidents of improper conduct by individual psychiatrists or other staff at a psychiatric hospital are not sufficient to sustain classwide relief. Similarly, in *Society For Good Will To Retarded Children v. Cuomo*, 737 F.2d 1239, 1245 (2d Cir. 1984), the Second Circuit stated, "Isolated instances of inadequate care, or even of malpractice, do not demonstrate a constitutional violation." *See also, Seide v. Prevost*, 536 F.Supp. 1121, 1135 (S.D.N.Y. 1982).

In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), in which the constitutionality of various conditions of the Metropolitan Correctional Center in New York were challenged, the Court stated, with regard to the challenge concerning room searches of prisoners, that although it may be that some guards have conducted these searches improperly, and assuming that the violations may even have reached constitutional proportion, this is not an action for damages and therefore such *isolated problems* do not warrant classwide injunctive relief. 441 U.S. at 557 n. 38, 99 S.Ct. at 1884 n. 38.

None of the decisions involving institutional settings, including *Rennie, supra, Bell, supra, Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) or *Scott v. Plante*, 691 F.2d 634 (3d Cir.1982), significantly reduce the requirement that challenged conduct must either be codified or a pervasive practice in order to rise to that level which will warrant an injunction against such conduct *in futuro*.[2]

## III. PLAINTIFFS' CONSTITUTIONAL CLAIMS

The Court will now direct its attention to each of the "constitutional" claims asserted by plaintiffs to determine whether a case for injunctive relief has been made. Initially, the Court notes that there have been changes in both published policies/regula-

---

1. The claim in the *Lewis* case was that troopers stopped travelers and searched them without probable cause simply based on their long-haired appearance.

2. The issues of "presumptive validity" of "professional judgment," to which a reviewing court must defer rather than interfere in institutional decision-making (addressed by the above authorities) bear upon whether given conduct (individual or universal) violates a constitutional right. Accordingly, they will be referred to hereafter, as warranted, in discussing particular policies or practices allegedly occurring at Lyons. These issues do not bear directly upon the basic concept of when injunctive (as opposed to other) relief for violations will lie.

tions and practices applicable to Lyons since the institution of this suit in 1979. In determining whether either a prohibitory or mandatory injunction is appropriate, this Court will assess present practices and published standards, not those of the past which have been superseded and, in some instances, corrected. Additionally, the Court notes that, "Plaintiffs [now] concede the inapplicability of the Eighth Amendment" ("cruel and unusual punishment") to any claim. P.B. 2. For reasons set forth hereafter, the defendants' motion is granted and the present class action dismissed in full.[3]

## A. PLAINTIFFS' CLAIMS BASED UPON THE FIRST AMENDMENT

The First Amendment to the U.S. Constitution interdicts federal action "respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, ... or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Additionally, an implicit constitutional right of privacy has emerged in our jurisprudence which is akin to First Amendment guarantees. *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

In December 1982, the V.A. Patients' Bill of Rights was promulgated. This, of course, now constitutes the defendants' official policy which must be measured against appropriate constitutional standards. Any evidence of practice in fact at Lyons varying from this policy must be assessed to determine whether it is merely episodic or prevalent, and, if the latter,

whether this practice violates one or more constitutional protections.

(1) Plaintiffs assert that defendants are depriving them of their First Amendment rights to freedom of thought, speech and expression, and further that defendants are chilling the expression of thoughts by plaintiffs to other persons with whom they come in contact while hospitalized.

This alleged violation is said by plaintiffs to primarily occur as a consequence of: affording plaintiffs what they characterize as non-private telephones for their incoming and outgoing calls (which permit staff and others to overhear a conversation),[4] controlling and surveilling the distribution of incoming mail to patients, and failing to provide stamps and letter-writing materials to patients on closed wards.

■ While some public telephones available for patient use at the hospital are more private than others simply because of their location in less populated or traveled areas, none of those phones are confined within the sort of privacy-insuring structure, *i.e.*, a booth or separate room, which plaintiffs appear to press for in this claim. In this institutional setting, the fact that pay telephones are not enclosed in booths and may be stationed in hallways or other areas where complete privacy is not guaranteed does not rise to the level of a violation of any patient's constitutional rights to either freedom of speech or privacy.

It is the firm policy of the hospital not to open patients' mail, except that mail may be opened in the presence of the intended recipient or sender, when there is reason to believe such mail may contain contraband,

---

**3.** The Court wishes to emphasize that individual tort claims by one or more affected patients are not the subject of this action. Any patient damaged or injured in his person or property in all likelihood has (or had) a viable claim either under the teaching of *Bivens v. Six Unknown Federal Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) or the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, if timely pursued. In the case at bar, the Court is called upon to determine whether prevalent violations of constitutional magnitude are widely perpetrated upon the plaintiff class under circumstances

warranting permanent injunctive relief. The Court's decision is against the plaintiff class. However, the availability of *Bivens* or Tort Claims Act remedies to individual class members certainly demonstrates that they are not left without legal recourse by failing to obtain relief from this Court.

**4.** Other allegations of the complaint concerning inadequacies of access to telephones predate the installation of pay phones on the wards at Lyons (¶¶ 81–88).

weapons or drugs, or when the patient is unable to handle mail due to his medical or psychiatric condition. 38 C.F.R. § 17.-34a(b)(1)(iii); (Ps Ex. 309, 314).[5] None of these impositions is sufficient to support a claim of constitutional dimension. They are well within the permissible range of administrative discretion. *Youngberg v. Romeo, supra.*

■ No exercise of any right conferred under the First Amendment is absolute. Rather, the exercise of First Amendment rights is always subject to substantial and legitimate institutional policies and goals. *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). One may borrow from the large body of caselaw regarding prisoners' rights as an analogy to an institutional situation such as a hospital. The Supreme Court in *Procunier v. Martinez, supra,* set the standards for review of claims of unconstitutional censorship in institutional settings. Relying upon such earlier precedents as *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Tinker v. Des Moines School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); and *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Court held that censorship is justified if the following criteria are met:

(1) The practice furthers an important or substantial governmental interest unrelated to the suppression of expression, *vis.,* its content;

(2) The restriction must be no greater than is necessary or essential to protect the particular governmental interest involved.

416 U.S. at 413–14, 94 S.Ct. at 1811. In *Bell v. Wolfish, supra,* 441 U.S. at 554–55, 99 S.Ct. at 1882, the Court upheld a prison regulation which barred receipt of

all personal packages by pretrial detainees, saying that prison authorities had not conclusively been shown to be wrong about the need for the rule. *Accord: Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984).

■ Application of this standard to the policy and regulation at issue here clearly warrants a conclusion that no violation of the Constitution is made out. The controlling regulation provides:

(c) *Restrictions.* (1) A right set forth in paragraph (b) of this section may be restricted within the patient's treatment plan by written order signed by the appropriate health or mental health professional if—

(i) It is determined pursuant to paragraph (c)(2) of this section that a valid and sufficient reason exists for a restriction, and

(ii) The order imposing the restriction and a progress note detaining the indications therefor are both entered into the patient's permanent medical record.

(2) For the purpose of this paragraph, a valid and sufficient reason exists when, after consideration of pertinent facts, including the patient's history, current condition and prognosis, a health or mental health professional reasonably believes that the full exercise of the specific right would—

(i) Adversely affect the patient's physical or mental health,

(ii) Under prevailing community standards, likely stigmatize the patient's reputation to a degree that would adversely affect the patient's return to independent living,

(iii) Significantly infringe upon the rights of or jeopardize the health or safety of others, or

---

**5.** In another, but related, context (locker searches), plaintiffs' own expert testified these were justifiable bases for intruding upon plaintiffs' privacy. Of course, a patient's rights to communicate by phone and the mail is recognized by the V.A. Patients' Bill of Rights, 38 C.F.R. § 17.34a(b)(1). This regulation speaks to

the promotion of a patient's ability to send and receive mail, and to make and receive phone calls via public telephones. This Court finds that there is no indication of prevalent conduct by Lyons' staff at present which abridges these codified rights.

(iv) Have a significant adverse impact on the operation of the medical facility, to such an extent that the patient's exercise of the specific right should be restricted. In determining whether a patient's specific right should be restricted, the health or mental health professional concerned must determine that the likelihood and seriousness of the consequences that are expected to result from the full exercise of the right are so compelling as to warrant the restriction. The Chief of Service or Chief of Staff, as designated by local policy, should concur with the decision to impose such restriction. In this connection, it should be noted that there is no intention to imply that each of the reasons specified in paragraphs (c)(2)(i) through (iv) of this section are logically relevant to each of the rights set forth in paragraph (b)(1) of this section.

(3) If it has been determined under paragraph (c)(2) of this section that a valid and sufficient reason exists for restricting any of the patient's rights set forth in paragraph (c)(1) of this section, the least restrictive method for protecting the interest or interests specified in paragraphs (c)(2)(i) through (iv) of this section that are involved shall be employed.

(4) The patient must be promptly notified of any restriction imposed pursuant to this paragraph and the reasons therefor.

(5) All restricting orders must be reviewed at least once every 30 days by the practitioner and must be concurred in by the Chief of Services or Chief of Staff. 38 C.F.R. § 17.34a.

Manifestly, in a hospital, an institution charged with the responsibility of fostering both the physical and mental health of its patients, it cannot be over-emphasized that the institution has a legitimate and substantial interest in preserving its therapeutic environment and the health of its pa-

tients to the fullest extent possible. This self-evident proposition cannot be seriously debated. *N.L.R.B. v. Baptist Hospital, Inc.*, 442 U.S. 773, 788, 99 S.Ct. 2598, 2606, 61 L.Ed.2d 251 (1979).

■ If a restriction is imposed for the protection of this interest, in the judgment of the patient's medical professional, and as concurred in by the appropriate Chief of Staff or Chief of Service upon notice to the patient, any restriction imposed must be done in the least restrictive way possible for no more than 30 days without review for necessity of continuation. Moreover, any restriction contemplated may only be imposed after a full consideration of the patient's history, current condition and prognosis, and then only if the medical professional further believes that the consequences of a full exercise of these rights are so compellingly serious and likely as to warrant the restriction.[6] *E.g., Mayberry v. Robinson*, 427 F.Supp. 297 (M.D.Pa.1977); *Peterson v. Davis*, 415 F.Supp. 198 (E.D. Va.1976).

*The Evidence*

■ Under the controlling regulation, effective as of December 10, 1982, each patient at Lyons has the right to communicate freely and privately with anyone outside the facility. Exercise of this right includes convenient and reasonable access to public telephones to make and receive calls, and to send and receive unopened mail. 38 C.F.R. § 17.34a(b)(1). If receipt of mail is restricted, the patient shall be required to open mail in the presence of hospital staff for the purpose of ascertaining whether it contains contraband material. *Id.*, subsection (iii). Each patient is to be afforded the opportunity to purchase, at his or her own expense, stamps and letter writing material. *Id.*, subsection (iv).

Various witnesses testified that they had difficulty securing stamps and writing ma-

---

**6.** Unless affirmatively demonstrated by plaintiffs to the contrary, it must be presumed that defendants adhere to the controlling regulation. *E.g., Neal v. Secretary of the Navy*, 639 F.2d 1029, 1037–38 (3d Cir.1981). Plaintiffs have made no demonstration of anything other than occasional deviations from such regulations.

terials on occasions. This seemed to be a problem in most instances regarding patients on closed wards without privileges. However, at most, these "deprivations" (if they can be so characterized) were infrequent and temporary.

Similarly, staff interruptions of patients' telephone conversations were either abnormal or amply justified. If Arthur Muglia was beaten by a nursing assistant with the telephone receiver while attempting to make a call during early morning hours, that staff-person's conduct was inexcusable. However, it is hardly illustrative of a course of conduct constituting a regular interruption of plaintiffs' First Amendment rights. The incident involving Dr. Watson demonstrates only an understandable mistake in one instance while carrying out the perfectly acceptable medical judgment that a committed psychiatric patient be intercepted in his efforts to arrange for transportation to leave the hospital unilaterally. In this case, when Dr. Watson was advised that Dr. Nora (the Chief of Psychiatry) was the other party to the patient's conversation, he promptly returned the receiver to that patient.

Plaintiffs have failed to demonstrate any actionable violations of their constitutional rights regarding use of the telephones or the mails. The mere fact that some members of the class may subjectively feel their privacy in making or receiving phone calls is infringed by virtue of the placement of unenclosed phones on the wards can scarcely warrant a conclusion that a constitutional deprivation is demonstrated.[7] Even if some few specific instances of interference with plaintiffs' phone calls and mail were made out, there has been no demonstration that the controlling regulation ensuring the right to make phone calls and send and receive mail is not followed in the normal course, or that defendants herein sanction illegal interference. *See City of Los Angeles v. Lyons, supra.*

(2) Under the purported cloak of the First Amendment, plaintiffs also assert that visitation both within the hospital and with friends from outside is so curtailed as to violate their constitutional rights of association and assembly.

Prior to July 9, 1984, there was virtually an absolute prohibition against patients from one ward at Lyons going to another ward to visit a patient there. There have always existed, however, numerous off-ward locations where patients could visit each other. Furthermore, as of July 9, 1984, by Professional Services Operational Memorandum # 89, the following new policy on interward visits was promulgated:

### INTERWARD VISITS BY PATIENTS

1. PURPOSE

To set forth policy and procedures for interward visits by patients.

2. POLICY

In order to provide safeguards against nosocomial infections, to prevent the introduction of contraband items, and to insure the smooth flow of ward operations, social visits from one ward to another are to be evaluated and approved on an individual basis by the head nurse or designee. No more than two patients will be allowed to visit another patient at one time.

3. PROCEDURE

a. Any patient wishing to visit another patient on another ward will request permission to do so from the head nures [*sic*] (or designee).

If permission is granted, that nurse will contact the head nurse (or designee) of the patient to be visited for further approval.

Once approval for an interward visit has been granted by each unit, appropriate arrangements will be made by each ward to facilitate the visit.

---

7. Loss of some measure of privacy is an "inherent incident" of confinement in an institution.

*Bell v. Wolfish, supra,* 441 U.S. at 537, 99 S.Ct. at 1873.

## 4. RESPONSIBILITIES

It is the responsibility of the treatment team to convey this information to patients and to insure compliance.

## 5. RESCISSIONS

PSOM # 54 dated 1/2/81

/s/

STANLEY B. KAHANE, M.D.
Chief of Staff

While a considerable amount of judgment reposes in the nursing staff under this revised policy, the criteria which are meant to guide nurses in approving inter-ward visits are expressed in the memorandum. The expressed circumstances under which such visits would be denied are surely within the legitimate sphere of hospital operations. Thus, they are proper limitations in this institutional setting upon rights of association and assembly. The Court will not presume that this new policy will be arbitrarily or capriciously administered merely to suit the convenience of nursing staff or for other improper reasons. With the promulgation of Memorandum # 89, any argument of unconstitutional restrictions upon the foreclosure of Lyons' patients to associate with each other falls.

█ Visitation by non-patients is not significantly restricted at Lyons, although the locations permissible in given instances may not be ideal. Plaintiffs presented only one concrete example of a non-patient being prevented from visiting a patient. Renee Smith, despite having made an appointment through staff in advance, was twice unable to see her husband Garri. She testified that she was given no explanation on these occasions after having come out from Newark, New Jersey. Accepting this statement as true, once again it is but one instance in what must have been thousands of visitations without incident or complaint during recent years. Nothing in the current record indicates that restrictions on visitation, without any explanation to anyone affected, was recurrent at Lyons. Furthermore, Garri Smith was a psychiatric patient, assigned to a closed ward, occasionally requiring restraints to control violent behavior, whose condition was some-times exacerbated by his wife's visits. Against this background the Court will not infer that any decision to restrict visitations with Mr. Smith was arbitrary or groundless. As with visitation among patients, plaintiffs' claims of violations of their constitutional rights to have reasonable access to nonpatient visitors are without merit.

█ (3) Plaintiffs also claim that the full exercise of their religious beliefs is unconstitutionally curtailed. They claim that there is a policy of unnecessarily confining patients to their wards, thus preventing them from attending congregate, formal services, and that private religious ministrations to such patients by a chaplain on the ward are an inadequate substitute. It is true that patients on closed psychiatric wards, without privilege cards, often are not escorted to congregate religious services taking place elsewhere.

The V.A. Manual provides:

When it is difficult or impossible for patients to attend services in the chapel, the Chaplain will arrange to have services on wards.

Regulation 38 C.F.R. § 17.342(b)(7) states:

The opportunity for religious worship shall be made available to each patient who desires such opportunity.

Thus, the defendant V.A. recognizes the importance of having religious services available to patients.

Undoubtedly congregate worship is usually preferable to a private ministration because of the uplifting experience of joint participation in a religious ceremony. However, some curtailments on one's pursuit of his normal religious practices are inherent in a hospital setting, particularly where patients on a closed psychiatric ward are involved. From the record before the Court, it appears that Lyons could perform better than it does, by providing congregate services on the wards (either personally or by broadcast). However, it is equally clear that no patient at Lyons is denied the opportunity to practice his religion with the aid of a chaplain of his faith. Assuming,

*arguendo,* that a constitutional (as opposed to merely a regulatory) obligation exists in this sphere, the policies in existence at Lyons are not *"prohibiting* the free exercise" by any patient of his religion. U.S. Const., Amendment I (emphasis added).

■ Plaintiffs also claim that certain incoming religious mail is censored, thus raising free speech and freedom of religion implications. The published V.A. policy provides for the screening of such material to determine if it contains offensive attacks on races or other religions. The deposition testimony of Reverend Law of Lyons does not demonstrate that he understands or applies the policy improperly or beyond its terms. Law testified that such review and screening rarely results in censoring religious materials. To the extent plaintiffs express concern that screening may result in censorship of materials other than those within the defined offending categories, they adduced no proofs in this regard. The policy contains its own limiting instructions and standards, reasonable as to time, place and manner. *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). On its face and as practiced, it cannot be said that the stated policy aim of screening for specific types of offensive literature is unconstitutionally overbroad.

To the extent that other claims are raised with First Amendment implications, including the alleged atmosphere that "chills" freedom of expression such as patient complaints, the Court has also considered them and determined that they lack both constitutional dimension and the degree of prevalence which is necessary for affording injunctive relief.

B. PLAINTIFFS' CLAIMS BASED UPON ALLEGED DEPRIVATION OF SUBSTANTIVE DUE PROCESS RIGHTS

The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law...." Plaintiffs' several claims of such deprivations are as follows:

Physical and Verbal Abuse of Patients

Lock-up and Shackling of Patients for Purposes of Punishment and Because Staffing Inadequacies Prevent Less Restrictive Alternatives

Confiscation of Clothing, Searches of Lockers and Failures to Prevent Theft of Patients' Property

Mismanagement of Food Services

Mismanagement of Patients' Funds Held by the V.A. by Restricting Access to them and Failing to Pay Interest Thereon

For reasons set forth hereafter, the Court determines that plaintiffs on their own proofs have failed to sustain these due process claims, whether considered individually or collectively.

(1) *Alleged Mismanagement of Patients' Funds*

Competent patients at Lyons may, if they wish, deposit personal funds in an account at the hospital. These accounts are maintained as an accommodation to patients who find it inconvenient or prefer not to use a bank off the grounds. Patients are told of their alternatives before they place their money in a non-interest bearing hospital account and indeed are advised to deposit their funds elsewhere.

By regulation, a veteran's right to hold, spend and have unrestricted access to his own funds is recognized and protected. 38 C.F.R. § 17.34a(a)(4)(i), (b)(4). If that right is to be restricted, such restriction may only be imposed pursuant to the provisions of § 17.34a(c), which sets out an elaborate and detailed procedure for placing restrictions against a veteran's use and possession of his funds. The regulation requires (1) prompt notification to the veteran of the restriction and the reason therefore, and (2) review of the restricting order at least once every 30 days by the person imposing it, together with the concurrence of the appropriate Chief of Service or the Chief of Staff. § 17.34a(c)(4) and (5).

■ The regulation also provides in sub-paragraph (b)(4) that a veteran's right to keep, spend and have access to funds in

his account shall be in accordance with instructions concerning personal funds of patients published by the Department of Medicine and Surgery. Plaintiffs' Exhibit 379 is the controlling comprehensive instruction within the V.A. regarding personal funds in patients' accounts. The stated policy is that patients' funds will *not* be routinely deposited in restricted accounts. Rather, only those newly admitted patients who have been judicially declared, or administratively rated by the V.A., as incompetent [8] will have their accounts restricted. Patients who have their accounts restricted at any V.A. hospital, because the treatment team determines the patients are incapable of handling their own funds, ¶ 8.03b.(3), are, in addition to the procedural protections spelled out in the regulations, to be advised of their right to appeal that determination to a review panel, to be represented by a person of their choosing, and to present evidence to the review panel, ¶ 8.03c.(1)–(3). The review panel is then to prepare a written summary of the evidence a copy of which is to be furnished to the patient and entered in his medical record. ¶ 8.03c.(4). The V.A. expressly prohibits any restriction of a patient's funds account as

(1) A punitive measure, or

(2) As a therapeutic control of modification of patient behavior.

¶ 8.03d.

Manifestly, the V.A. has in place a comprehensive procedural scheme for the protection of a patient's right to possess and control his own funds while hospitalized. These protections clearly achieve the due process standard set out in *Youngberg v. Romeo, supra*, which requires only that a decision to restrict a patient's account be the product of a professional's judgment.

The testimony adduced by plaintiffs at trial did absolutely nothing to overcome either of the strong presumptions that (a) V.A. policies and procedures are adhered to at Lyons, or (b) decisions to restrict patients' accounts are professionally acceptable judgments.

▇ The question of failure to pay interest warrants some discussion here. Clearly no rights of competent patients are violated, since they are informed at or about their admission that funds held by the hospital pay no interest and are encouraged to bank their funds elsewhere. Accordingly, they each make a knowing election when choosing to deposit with the V.A.

The record shows that total present balances held for Lyons' patients are about 2 million dollars. In fiscal year 1980, the figure was even higher, and represented funds in about 1,000 accounts. Average deposits for April of that year were $126,471. In 1980, there were 173 accounts with balances *over* $2,500. Seventy-four accounts had balances over $10,000, and fifteen had balances over $25,000. Plaintiffs have also introduced a number of individual patient account cards in which the largest individual balances were $121,000 and $90,000. This money is not held at Lyons, of course. It is deposited daily with the Federal Reserve Bank on Liberty Street in New York City.

It is admitted that no interest is credited to these accounts despite their size and potential for earnings, even in insured certificates. "Incompetents"—which term C.S. Lewis (Lyons' Chief of Fiscal Service) understands to mean *closed ward patients* —may not be told of this limitation and presumably could not appreciate its significance. Lewis estimates that up to *40%* of the roughly 1,000 accounts in patients' funds belong to these "incompetents."

Plaintiffs allege that their privacy and substantive due process rights are violated by the failure of Lyons to pay interest on the dollars it holds on deposit with the Federal Reserve Bank. They further allege that this money is held in trust, and the failure to properly invest it so as to insure reasonable earnings on the corpus violates both common sense and the basic

---

**8.** *See,* 38 C.F.R. § 3.353 for administrative incompetency ratings procedures. Competency is to be presumed in cases where there is clinical doubt as to the patient's ability to handle funds.

concepts of trusteeship. They request that this Court "order Lyons to fulfill its mini-mal fiduciary responsibilities towards its patients." P. Br. 334.

Once again, the Court emphasizes that the present action is limited to claims of constitutional dimension. At most, plaintiffs have here asserted that the V.A. and Lyons have breached a fiduciary duty as trustees of funds held for incompetent patients (incapable of making their own intelligent financial decisions). Defendants argue just as vigorously that they are providing a voluntary service and are at most mere custodians of these funds. These charges and replies do not raise a claim of deprivation of property without due process. Nor was this issue of breach of a fiduciary duty ever asserted as a pendent claim of non-constitutional magnitude. As a "constitutional" claim it is dismissed; the court chooses not to entertain it on any other basis and leaves the parties to pursue it in subsequent "non-constitutional" litigation if necessary.

### (2) *Mismanagement of Food Services*

■ This Court can well appreciate the significance of meals in a hospital routine. Mealtime is one of few "occasions" in the course of a tedious, often uncomfortable existence under even the best hospital conditions. A good meal is surely even more of a pleasure and an unpalatable one more of a disappointment for a hospital patient than for one of us on "the outside." Once again, however, the Court must assess this question on a constitutional, not a visceral or emotional, basis.

Several assorted complaints about particular food problems, including the eating by staff of food intended for patients, were clearly so varied and episodic as to fall far short of such prevalent conduct as is required to support an injunction. Problems of food temperature, however, over the years have been sufficiently recurrent to require further analysis here.

It is clear that involuntarily hospitalized patients have the due process right to "adequate food." *Youngberg v. Romeo, supra,*

457 U.S. at 315, 102 S.Ct. at 2457. The cases show that food is adequate if it does not harm the person eating it.

Courts have considered claims concerning food in the context of prisoners' rights cases. In *Snow v. Gladden,* 338 F.2d 999 (9th Cir.1964), the Court affirmed the dismissal of a prisoner's complaint alleging that the prison had not provided him with an "ulcer diet," although the prison doctor had ordered such a diet for him. The Court held that the complaint, even if considered to state a due process claim, was frivolous and that no civil rights had been violated, since "there are no sufficient allegations of any serious bodily harm to appellant." *Id.* at 1001. Similarly, the First Circuit has affirmed dismissal of an Eighth Amendment claim grounded in lack of "hot meals," since the record showed that three meals were provided daily. *Hoitt v. Vitek,* 497 F.2d 598, 601 (1st Cir.1974). *See also, Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 862–863 (4th Cir.1975).

The fact that a plaintiff's taste may be offended by the manner in which food is prepared has not been considered to be a matter for a federal court unless a health hazard was created thereby. *Feazell v. Augusta County Jail,* 401 F.Supp. 405 (W.D.Va.1975). *See also, Lunsford v. Reynolds,* 376 F.Supp. 526 (W.D.Va.1974). In a case where a prisoner alleged that "he was given watery gravy and oatmeal with no sugar," the Court dismissed the complaint, saying simply that those allegations "do not arise to constitutional deprivations even assuming their veracity." *Cassidy v. Edwards,* 392 F.Supp. 337, 338 (W.D.Va. 1975). Finally, addressing itself to a claim that a prisoner was deliberately served cold or unpalatable food, one Court has held that such allegations do not state a constitutionally cognizable claim if prisoners are otherwise adequately fed. *Boston v. Stanton,* 450 F.Supp. 1049, 1055 (W.D.Mo.1978).

Running through each of the foregoing cases is the consistent thesis, either express or implicit, that absent actual harm, there is no cognizable constitutional claim

for alleged inadequacies in institutional food.

Cases cited by plaintiffs to this Court are not to the contrary. Indeed, those cases emphasize the importance, in this context, of the presence of a real and substantial threat of harm from the food served. For instance, in *Murphy v. Wheaton*, 381 F.Supp. 1252 (N.D.Ill.1974), it was alleged not just that food was delivered cold and without a cover, but that it arrived in an unsanitized, unwashed garbage wagon covered with filth and emitting stench; that it was spoiled and rotted. These facts were deemed to go beyond allegations of mere unpleasantness, and were of sufficient substance to require judicial intervention. *Id.* at 1261. Similarly, the allegation in *Robles v. Coughlin*, 725 F.2d 12 (2d Cir.1983), was that food was contaminated with dust, rocks, glass and human waste.

The plaintiffs' evidence supports a finding that food transported from kitchens to the wards for service on trays repeatedly arrives in such a state that "hot food" is tepid and cold food warmer than it should be when finally served to patients. The trays and carriers used to transport that food don't preserve it at intended serving temperatures. However, dieticians do respond to food complaints, and at least Mr. Falter (the most substantial critic of food temperature) had a microwave on his ward for reheating his "hot food." Nowhere in the record is there evidence that recurrent, widespread physical or psychiatric harm has resulted to patients from food served at inappropriate temperatures. Accordingly, this inadequacy in the food does not produce a violation of plaintiffs' due process rights.

### (3) *Impacts Upon Plaintiffs' Personal Property*

The Court will proceed at this point to analyze various alleged impacts upon a patient's property, beginning with his admission to Lyons.

Upon admission, a patient's clothing is routinely taken from him and he is issued hospital garb, usually pajamas. Clothing which he wears is laundered, placed with other clothing (if any) brought on admission, marked for identification purposes and returned to a patient in a few days.[9] Although pajamas obviously remain appropriate for bedridden medical patients, under the V.A. Patients' Bill of Rights, each patient has the right to wear his own clothing while hospitalized. 38 C.F.R. § 17.-34a(b)(2). Despite one nurse's opinion, stated to plaintiffs' expert Dr. Gaver, that patients were kept in pajamas to keep them from eloping from the hospital, this Court finds that this is not the pervasive policy or practice at Lyons or elsewhere within the V.A.

Plaintiffs argue that the detention of their clothing upon admission is a deprivation of their property without due process, through employment of a more restrictive means than the least restrictive viable alternative. An arguable claim might have been stated under prior practices which included much lengthier retention of private clothing. In considering the need for injunctive relief, however, the Court again finds present practice to be the best guide for anticipated future conduct. The temporary detention of personal clothing to be laundered before return to the patient is unassailably grounded upon considerations of essential hospital hygiene both for the patient himself and those around him.

The similar detention of clothing which a patient brings with him (unworn) is clearly less essential, although inspection for cleanliness or the concealment of weapons, drugs or other impermissible property is understandable. The Court can also perceive an administrative convenience in returning all of a patient's clothing at once rather than piecemeal. Moreover, this temporary deprivation of personal property reflects at most "a de minimis level of imposi-

---

**9.** Prior policies of longer detention of a patient's clothing have been modified during the penden-

cy of the present suit.

tion with which the Constitution is not concerned." *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977); *Bell v. Wolfish, supra,* 441 U.S. at 539 n. 21, 99 S.Ct. 1874 n. 21.

 Plaintiffs also argue that they are subjected to unreasonable searches of their property upon admission and during their stay at Lyons. This argument raises predominantly Fourth Amendment considerations but will be discussed at this point.[10] Initially, the Court determines that searches of a patient's clothing or belongings upon admission for potential weapons, drugs, liquor or other impermissible property is clearly reasonable for it serves legitimate, paramount hospital goals for the prophylactic protection of the patient and others in the hospital setting. The Court now turns to analyze the issue of searches of patients' lockers.

Under the teaching of the Supreme Court's recent decision in *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the Fourth Amendment is applicable to searches in this V.A. hospital setting. As the Court continued, however, 469 U.S. at —— ——, 105 S.Ct. at 741, 83 L.Ed.2d at 731–32:

> To hold that the Fourth Amendment applies to searches conducted by school authorities is only to begin the inquiry into the standards governing such searches. Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place. The determination of the standard of reasonableness governing any specific class of searches requires "balancing the need to search against the invasion which the search entails." *Camara v. Municipal Court, supra,* [387 U.S. 523] at 536–37, 18 L.Ed.2d 930, 87 S.Ct. 1727 [1735]. On one side of the balance are arrayed the individual's legitimate expectations of privacy and person-

al security; on the other, the government's need for effective methods to deal with breaches of public order.

The Court then added that strict "probable cause" is not required to sustain a student search. "Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* 469 U.S. at ——, 105 S.Ct. at 736, 83 L.Ed.2d at 734. Although the United States Supreme Court declined to rule on the specific point, this Court adopts the ruling of the Supreme Court of New Jersey that a high school student has "an expectation of privacy in the contents of his locker." *State in Interest of T.L.O.,* 94 N.J. 331, 348, 463 A.2d 934 (1983). So too should the hospital patient whose locker is also "a home away from home." *Ibid.* This Court determines that those searches customarily conducted are reasonable and thus constitutionally permissible, and that the evidence of other questionable searches was again too varying, infrequent and episodic to support a claim for injunctive relief.

The evidence in this case has shown that it is the hospital policy to conduct "routine sanitary searches" of patients' lockers and chests of drawers in the Nursing Home Care Unit (NHCU) in order to discover health hazards. These elderly patients often put food in their lockers which spoils because they forget about it. This spoiled food attracts roaches. Also, soiled clothing is sometimes placed in lockers and forgotten by these patients. These sanitary searches are conducted infrequently outside of the NHCU. The evidence has also shown that before an inspection of any locker is performed, the policy provides that a patient is told that the inspection will take place and is asked if he wishes to observe it. Many patients do not wish to observe and so the search is performed outside of their presence.

In addition to the routine sanitary inspections, occasionally other inspections are

---

**10.** Plaintiffs argue that considerations of privacy rights beyond those of the Fourth Amendment also apply on the present issue. Not so; privacy considerations are an integral part of the Fourth Amendment question itself.

conducted when it is believed that one or more patients may possess contraband, such as a dangerous weapon, drugs or liquor, which could impair their functioning or treatment and create a dangerous or unhealthy situation within the hospital. Those searches are also carried out by nurses with notice to the patients and the purpose of these searches is solely to eliminate the hazard.

Although patients have their own keys to their lockers, the nursing staff maintains a master key which is used both for searches and to open lockers for patients who lose their keys.

It is a reasonable policy for a psychiatric hospital to conduct sanitary searches of patient's lockers for rotting food or unhealthy substances and also that searches for contraband are proper and necessary if there is cause to believe contraband is present. Plaintiffs' proofs fail to demonstrate that there is a prevalent practice contrary to hospital policy regarding searches or that searches for improper reasons are sanctioned by the defendants. *City of Los Angeles v. Lyons,* 461 U.S. 95, 105–06, 103 S.Ct. 1660, 1666–67, 75 L.Ed.2d 675 (1983).

Two patients on the Nursing Home Care Unit, George Falter and Robert Mahler, confirm that searches on that unit are carried out as stated in Supervisor Dodman's affidavit (P.Exh. 374). Both patients stated that they were present during the searches done of their lockers. The one search about which Falter testified was for contraband, a knife which he acknowledged having with him that he had used for arts and crafts and for cutting up his food. There is no evidence that this was his own knife rather than one which he had taken with him from the arts and crafts department of the hospital. Mahler stated that to his knowledge nothing was taken during the searches of his locker, that he believed the searches were for contraband (although more probably for routine sanitary reasons), and that at the time of his deposition (November 13, 1980) no such searches had been carried out for six months.

Only three other patients testified that their *own* lockers had ever been searched. William Hilbert testified that his locker had been searched several times, but could provide no details or information whatsoever except as to one such search. On that occasion he testified that the search was for a putty knife, which he had been using when he was working to strip and wax floors at the hospital. The knife was taken in the search, but there was no evidence that the knife was Hilbert's own knife rather than one provided to him by the hospital to do his work. In light of the potential of that item to be used as a weapon, this search was clearly reasonable.

Charles Bruno stated that his locker was searched once by nursing staff, looking for contraband but nothing was taken. He said that he did not witness this search but knew about it because his clothes were in disarray and staff, when questioned, told him they had searched for contraband. A second "search" about which he testified was not clearly carried out by staff, but by an unidentified person. Bruno also testified that he did not consider that searches concerning him were done for inappropriate reasons.

Third, John Sousa testified in somewhat vague terms about being "in kind of a daze" and seeing a woman going through his locker looking for dirty pajamas, because patients would not turn them in. He said that he lost a T-shirt during this search. No time or date was identified, but an affidavit signed by Sousa places it as having occurred in July 1979, now six years ago. This affidavit demonstrates that he did not in fact see any search but just found the T-shirt missing. Explaining the discrepancy, Sousa stated that he has:

> ... blanks of memory sometimes. Sometimes I see something and then I don't ... my memory is tricky.

At a later point he testified that he saw the woman throw the shirt down and that he didn't know what happened to it. He testified that this one time was the only time his locker was "searched", out of nine ad-

missions ranging from April 9, 1978 to October 4, 1982.

None of these searches can be adjudged wrongful or inappropriate. Nothing was taken from any of these patients except contraband (two knives), which probably belonged to the hospital in any event. And one T-shirt was somehow lost.

As for searches of other patients' (non-witnesses) lockers, the details were too skimpy for conclusions to be drawn. Such searches were testified to by Charles Bruno and William Hilbert. Bruno claimed that he saw cigarettes continually being taken out of patient Frank Williams' locker and that Williams smoked one to two packs per day. He testified that he never saw cigarettes removed from any other locker. Based on this information, there is no way to know if Williams had restrictions on his smoking for medical reasons or if he had pilfered other patients' cigarettes, which nursing personnel were returning to them. In other words, there are as many proper reasons as improper ones which explain the taking of Williams' cigarettes, if this did occur.

William Hilbert testified that he saw coffee taken out of patient Ferrante's locker at various times by staff during an undisclosed year, which could have been 1979. No details were provided. Hilbert also testified that he once witnessed a search for ammunition by hospital police. During his testimony at trial he claimed it was his locker as well as those of his roommates which were searched, but in his deposition he testified that "a guy's" locker was searched for bullets. In trying to explain this discrepancy, on cross-examination he said "I don't know the whole thing. It's just what I was told." Thus, the story about the bullets appears to be hearsay, but in any event was a reasonable search for contraband.

In conclusion, the bulk of these few searches over the years since 1979 were, according to plaintiffs' own testimony, done for perfectly proper and appropriate reasons, namely for contraband, *i.e.*, knives or bullets, or for sanitary reasons. Even the remaining few incidents, such as the coffee and cigarette searches, were not shown necessarily to be improper. In any event there is no evidence to show that the defendants herein knew of the latter or would sanction the stealing of patients' belongings, or that these incidents occurred in recent years. They are simply isolated events in the very long life of a large institution. As demonstrated by the foregoing review, there is no basis for an injunction based upon searches of patients' belongings.

▉ In a related argument, plaintiffs claim that rampant theft and other loss of patients' property at Lyons supports a claim for the deprivation of their property without due process of law. As a matter of law, these claims cannot be maintained under that banner. Initially, there is no evidence that defendants either condoned or callously ignored any such condition, assuming it even exists beyond levels that might be normally expected. Furthermore, any plaintiff whose property is taken under circumstances where the fault of the hospital or its personnel can be established has (or had) an *exclusive* remedy to redress that wrong by a recovery of money damages under the Federal Tort Claims Act. 28 U.S.C. § 2671 *et seq.* Injunctive relief is not available and the use of constitutional terminology does not enhance plaintiffs' position. (See extensive argument in Defendants' Main Brief in Support of the present motion at pp. 196–200).

### (4) *Alleged Physical and Verbal Abuse of Patients*

▉ Evidence of several incidents of alleged physical and verbal abuse of patients was submitted by plaintiffs. Unlike other subjects treated in this Opinion, the Court feels it unnecessary to evaluate and weigh this evidence in detail. To the extent evidence of a particular event was not inherently implausible, this Court is prepared to accept that the incidents related did occur. Once again, some of those incidents might well have justified a claim under the Federal Tort Claims Act, *supra*. However,

plaintiffs fail in two significant (and related) particulars to establish their claim. First, considering the thousands of contacts between Lyons' patients and staff (with varying degrees of tension and in many cases the legitimate need to use force), the plaintiffs failed to prove, on their own evidence, a pervasive pattern or practice of abusive conduct by Lyons' staff towards its patients. Secondly, under the teaching of *City of Los Angeles v. Lyons, Rizzo v. Goode,* and *Lewis v. Hyland, supra,* there is insufficient proof that any of the defendants have caused, contributed to or even condoned verbal or physical patient abuse. As recognized in plaintiffs' brief, the V.A. Manual itself condemns physical abuse and requires hospital managers to give such problems "constant attention." No contrary prevailing practice at Lyons has been proven. No substantive due process violations against the plaintiff class were established. No injunctive relief may issue.

### (5) *Alleged Lock-up and Shackling of Patients Without Proper Justification*

Although some specific examples and broad, general statements were advanced by plaintiffs to demonstrate the abusive use of closed wards and physical restraints, plaintiffs' proofs again failed to establish that these practices are so recurrent, and/or endorsed by the defendants that constitutional violations have occurred and that injunctive relief is warranted. In fact, in most instances recounted to this Court, arguable, bona fide reasons were shown to support such treatment of the patient, at least as the situation appeared to those encountering it. Regretable as it may be, it is frequently necessary to impose closed ward status and/or restraints on patients who often suffer from acute mental disorders that generate conduct ranging from disorientation to eruptions of aggression and violence. In the selection and application of such restrictions upon its patients, defendants did not violate the Fifth Amendment rights of the plaintiff class.

### (6) *Additional Claims Alleging Violations of "Substantive Rights"*

Plaintiffs argue due process violations regarding many of their claims which are also grounded upon First Amendment considerations. The latter have been discussed and disposed of under Point III–A above. No Fifth Amendment causes of action have been established as to those claims either.

Whatever other "substantive" claims of the plaintiffs may be discernible from their lengthy pleadings have not been supported by sufficient proofs to require specific analysis by the Court. They also fail to withstand defendants' present motion under *Fed.R.Civ.P.* 41(b).

### C. PLAINTIFFS' CLAIMS ALLEGING DEPRIVATION OF PROCEDURAL DUE PROCESS UNDER THE FIFTH AMENDMENT, AND RIGHT TO COUNSEL

No viable claim of deprivation of right to counsel under the Sixth Amendment has been established. That right exists only "[i]n all *criminal* prosecutions" (emphasis added); and there is no evidence in the record of any member of the plaintiff class being involved in such a matter where this right was infringed. Nor is there evidence in the case demonstrating any pattern or policy of defendants to deny plaintiffs access to counsel for civil matters, including complaints about treatment or conditions at Lyons. The V.A.'s own regulations acknowledge the right of patients to private visits with their attorneys. 38 C.F.R. § 17.34a(b)(1). No violations of the attorney-client privilege were established. Furthermore, the record reveals instances when the active intervention by attorneys secured action at Lyons beneficial to their patient-clients. (See incidents involving patients James Kalafian and John Cook discussed at pp. 216–217 of plaintiffs' Brief opposing the present motion.)

Plaintiffs also claim deprivation of basic rights of procedural due process. Although discussions in the plaintiffs' Briefs frequently mix procedural and substantive

due process arguments, those arguments which appear to focus upon procedural due process are as follows:

1. establish a procedure whereby a patient can participate in decisions regarding restrictions on his liberty before those decisions are made or implemented;

2. provide assistance of an independent, effective advocate to hear and prosecute patient grievances;

3. provide distribution to and education of both patients and staff of the V.A. Bill of Rights and procedures pursuant to which Lyons patients can pursue complaints and enforce their rights.

 The demand summarized in item number 1 above is rarely feasible, particularly with a patient who is violent, inebriated or suffering from acute mental illness. Furthermore, such a procedure is neither constitutionally required nor an advisable use of medical personnel, whose primary concerns must be with treatment, not hearings. *Parham v. J.R.*, 442 U.S. 584, 605–06, 99 S.Ct. 2493, 2505–06, 61 L.Ed.2d 101 (1979).

 Regarding the second demand set forth above, Lyons has a patient representative, or advocate: Jules Swickle, a man of more than 30 years experience, with a masters degree. Although Swickle often does not pass along complaints which he feels are groundless, he is available to discuss those complaints with patients. He refers other complaints to the proper departments for consideration. Although Swickle also serves as Lyons'. Administrative Assistant to the Chief of Staff, and devotes about 25% of his time to duties as the patient representative, those facts do not mandate a decision that he is automatically ineffective in his latter role. He is not encumbered by a conflict of interest as plaintiffs assert. A hospital is *not* an adversarial arena. Patients, physicians and staff alike have only one legitimate objective, common to all: the treatment of the patient in the best way possible. That some patients may perceive the hospital and its administrators as adversaries does not make it so. Furthermore, although the advantages to a patient from a completely independent advocate are understandable, there are also advantages which Mr. Swickle can bring into play. In his position he enjoys the trust and respect of high-level administrators at Lyons, plus direct access to them. As such, he is in a position to be an effective advocate of any patient's grievance which he in his experience believes worthy of management consideration. Whether considered on its own, or in comparison to patient advocates utilized in other V.A. hospitals who have them, (and many do not) the system employed at Lyons and implemented by Jules Swickle does not violate any of plaintiffs' procedural due process rights.

Thirdly, Lyons patients know, or have access to knowledge of, the rights which they enjoy as patients and the means of airing their complaints. Since December 1982 the V.A. Bill of Rights has been in effect. There is a Lyons' Patients' Handbook and posters placed in the wards which are stamped to designate Mr. Swickle as the patient representative. Swickle is frequently mentioned as patient representative in the hospital newspaper *Pipe Lyons.* Patients can review treatment decisions with their own treatment teams and can register complaints with or make inquiries to others. Plaintiffs' own evidence reveals the following examples of the latter:

(1) John Cook had a meeting about his treatment with Dr. Cohn, Chief of Staff.

(2) Cook also testified that the Chief of Staff approved his conducting Bible Study classes.

(3) Wanda Daniels testified at her deposition that she and Jules Swickle, the patient advocate, reviewed complaints brought to Jules Swickle by Alan Whitlock and that Jules Swickle had referred to her 10 to 12 complaints in the past year for review and investigation.

(4) William Hilbert stated that he went with patient Vernon Morris to the administration building to complain about an alleged incident of abuse and the administrator tried to talk to them, although Morris walked out.

(5) George Falter complains directly to the kitchen staff about food and they come to his ward to try and help him.

(6) Eugene Banko testified to a meeting which he had with Jules Swickle in Swickle's office.

(7) Frank Cupano testified that he went to Jules Swickle and Wanda Daniels about various complaints.

(8) Evidence indicates that a patient was speaking with the Chief of Psychiatry on a ward telephone.

(9) Charles Bruno admitted that he frequently talked with the Chief of Psychiatry and knew he could file a complaint with her if he saw abuse.

(10) Lewis Wycoff testified that he spoke with the hospital director himself about his complaint about his medical records being released.

(11) Wycoff also testified that he once took a dirty glass to Jules Swickle to complain about it.

(12) John Sousa testified that he had gone to Jules Swickle to complain.

(13) Randy Garris testified at his deposition that he had gone to the hospital director to complain.

Furthermore, plaintiffs' evidence was inadequate to establish that Lyons' staff was so uniformly unaware of patients' rights as to systematically deny them procedural due process to assert those rights and express complaints.

The gist of plaintiffs' complaints about lack of avenues to provide procedural due process is rather dramatically revealed in two sentences from their Brief in Opposition to Defendants' present motions:

Patients in a large institution are typically afraid to complain about the ward staff. *Id.* at 218.

and

Thus, patients' reluctance to speak up becomes a survival skill in the abnormal setting of a large institution. *Id.* at 219.

Plaintiffs there are saying that reluctance to pursue a grievance is endemic to *any* large hospital and is predominantly the result of the patient's subjective perceptions. Permanent injunctions against a defendant are not predicated upon such subjective feelings of a plaintiff.

## D. PLAINTIFFS' CLAIMS BASED UPON ALLEGED VIOLATION OF THEIR RIGHTS TO EQUAL PROTECTION OF THE LAWS

This Court also determines that plaintiffs have failed to establish on their own proofs of any violation of their Fourteenth Amendment rights to equal protection of the laws.

Defendants argue vigorously that under no set of facts could an equal protection argument be sustained, purely as a matter of law. They thus contend that this Court should, in essence, reverse Judge Ackerman's rulings at the motion stage on this legal theory. *See Falter v. Veterans' Administration,* 502 F.Supp. 1178 (D.N.J. 1980). This Court refuses to follow that course and chooses to be bound by that decision as law of the case. Applying the principles enunciated in that decision, however, plaintiffs' proofs have failed to substantiate their claim.

To quote from the *Falter* Opinion:

The plaintiffs' equal protection claim can, at least for purposes of initial analysis, be boiled down to two basic contentions:

(1) Patients are treated in a substantially different manner at Lyons from the way patients are treated at other V.A. hospitals.

(2) The defendants do not have a constitutionally sufficient reason for this unequal treatment. [*Id.* at 1182–83]

. . . . .

Whatever the appropriate standard, the present case remains an unusual equal protection case insofar as it raises issues not relating to inequalities created by legislative acts or by administrative rulemaking but rather to unequal administration of benefits such that individuals who are ostensibly entitled to receive identical benefits under the law are in fact receiving substantially different treatment depending upon where they go to receive those benefits. [*Id.* at 1185–86]

. . . . .

I wish to emphasize that in so holding I am not creating a substantive right to

any particular type of treatment under the concept of equal protection. I am simply holding the V.A. to a standard of treatment that it itself has created through the operation of its hospitals. Nor am I requiring perfect equality or mathematical nicety. It is only when substantial differences in treatment exist that equal protection is violated. [*Id.* at 1187].

This Court notes initially that although certain conditions complained of do not in themselves establish other constitutional violations (*supra*), they may nevertheless be considered individually and collectively in determining whether "substantial differences in treatment exist" at Lyons which violate patients' equal protection rights. In the case at bar, plaintiffs have not established that such substantial differences exist, as a matter of Lyons' policies or uniform practices, that it can be said that conditions there violate the equal protection rights of the plaintiff class.

As was true with some conditions discussed above in the context of other allegations, certain conditions at Lyons, while perhaps unpleasant or inconvenient, are just not of sufficient significance to support an equal protection claim. Examples of these include food not of ideal temperature, failure to hold congregate religious services on the wards, and placing telephones on the wards which, though available, are not in private booths. Although these conditions are not ideal, they do provide the opportunity to practice religion, the necessities of balanced, nutritious food, and access to telephones; hence no equal protection violations.

Other allegations have been proven to be merely episodic and not so pervasive as to constitute "conditions" throughout the Lyons hospital. Examples of those are: allegations of physical and mental abuse, alleged inappropriate use of restraints, and an isolated prohibition of a wife's visit to a patient.

Other conditions which plaintiffs have established as existing in the Lyons community represent rational, permissible and understandable variations from either an ideal or the norm, that is, though different from conditions elsewhere they are not "substantially different." Into this category fall such items as: the use of a patient advocate who is also a member of the Lyons staff with other duties, and Lyons' method of handling patients' clothing upon admission.

Other "evidence" introduced by plaintiffs consists of cold statistics which (while they might indicate levels of performance at Lyons comparing unfavorably to other hospitals sampled) were not translated into actual results demonstrating in fact substantially different treatment of the Lyons hospital population. Staff to patient ratios and patient turnover rates are the most prominent examples. Plaintiffs' leading witness on their equal protection claim was Jack Franklin, a statistics expert with no professional training or experience in psychiatry, medicine or hospital administration. The thrust of Franklin's testimony was to identify certain differences at Lyons versus two separate subsets of hospitals within the V.A. system. These differences, he concluded, indicate that quality of performance and productivity at Lyons are below those of most of the other V.A. hospitals with which it was compared.[11]

The statistics which he recited and relied upon in his direct testimony would apparently allow him to say nothing about the quality of care actually rendered at Lyons. When asked about numerous factors which could affect or explain ways a hospital's productivity appeared to be lower than others, Franklin repeatedly and uniformly had no knowledge or information to demonstrate whether they were or were not factors affecting Lyons' productivity. In other words, he knew nothing about any rational basis which could justifiably ex-

---

**11.** Franklin measured productivity by using the turnover rates for his own subset of thirteen V.A. hospitals. Performance was thus reflected in productivity which in turn, he said, indicated a hospital's effectiveness in successfully treating patients. This quantifier was further defined to simply indicate the number of patients moving from admission through to discharge from the hospital.

plain the reason for the existence of differences between one hospital and the next.[12] For example, at the comparable subset hospitals, he did not know about patient population mixes which could affect turnover rates. He did not know whether Lyons was admitting more older patients who would be likely to stay longer at the hospital. He did not know what effect the number of lobotomized patients had on turnover rates. He did not know what effect any differences in (1) admissions policies, (2) "AMA" discharge rates; (3) variations among treatment philosophies of different psychiatrists, or (4) aftercare, post-discharge, placement opportunities would have on the turnover rates at any of the hospitals. All of these, however, were acknowledged as factors which could explain turnover rates. In short, no negation of any possible rational basis for differences was presented. All Franklin knew was there were differences in statistics when the hospitals were compared.[13]

Similarly, Franklin was aware only of the statistics concerning staff to patient *ratios* at Lyons versus the other hospitals he studied. He did not have information to permit him to translate those statistics into any conclusion that unconstitutionally disparate care or attention to Lyons patients was actually present. (See excerpts from the record quoted and analyzed at Defendants' Reply Brief at 37–41).

In short, measured against the standards and analytical pattern set forth by Judge Ackerman (*supra*), the plaintiff-patients at Lyons have failed to establish their claim that their treatment, either clinically or "as human beings," at that institution denies them equal protection of the laws. 502 F.Supp. at 1185.

## SOME CONCLUDING OBSERVATIONS

Some final observations are in order. No one would claim that Lyons is an ideal setting. It is an older facility than many in the V.A. system. It is among the largest V.A. hospitals, both in terms of total and psychiatric patients. It could make good use of additional staff both to provide more attention to patients and to ease the burdens imposed upon current personnel. Using existing staff and perhaps by utilizing some fully responsible patients, Lyons should increase the availability of escorts to accompany patients who have legitimate reasons to leave their wards but cannot do so unescorted. There should be greater efforts to promote increased recreational activities and fuller use of the facilities available on the hospital grounds. Greater attention should be taken to solutions for the problem of tepid food served on trays in the wards. None of these deficiencies, either individually, collectively or in connection with other items discussed more extensively above, rises to the level of a violation of plaintiffs' constitutional rights.

To the extent that this lawsuit has focused upon these issues, the Court is confident that meaningful attention and response will be forthcoming. In this regard, the Court notes the modifications in policies that have been implemented during the course of this action, such as those regarding a patient's own clothing and inter-ward visitations by patients. The VA Bill of Rights was adopted in 1982. 38 C.F.R. § 17.34a. Additionally, JCAH periodic reviews and the VA's own Systematic External Review Program (SERP) monitor Lyons' performance with a critical eye, thereby diminishing the need for court intervention. In the language of *Lewis,* this Court determines that there is "no 'substantial threat' of future violations" of any constitutional rights of the plaintiffs, and no "pressing need [for] injunctive interference" in the future operations of the Lyons Veterans Administration Medical Center. *Lewis v. Hyland, supra,* 554 F.2d at 97.

---

**12.** He also testified he had never been to any of the V.A. hospitals in his subsets.

**13.** Even on this statistical analysis, on the issue of whether Lyons provides good quality care to its patients in comparison with the other twelve hospitals of his own subset, Franklin acknowledged that using his statistics Lyons ranked at the median, and, more importantly, he could not and did not say whether the care actually provided at Lyons was in any substantial way qualitatively different from that actually provided at any other V.A. Medical Center.

Defendants have prevailed in this lawsuit, for failure of the plaintiffs to establish incursions upon their rights which rose to constitutional dimension and warranted the severe remedy of either a mandatory or prohibitory injunction from this Court. However, defendants should be mindful that those who perceive that patients' rights are being violated, be they patients themselves or such persons as the Public Advocate, will and should be diligent in bringing those matters to light.

Defendants' motion granted; judgment is entered for defendants dismissing this action, with prejudice and without costs; an Order reflecting this decision is enclosed.